**UNITED STATES of AMERICA, Plaintiff–Appellee,**

.v.

**Louis Elton STONE, and Denise Sienhausen, Defendants–Appellants.**

**No. 91–2193.**

United States Court of Appeals, Fifth Circuit.

April 29, 1992.

427

Paul C. Looney, Houston, Tex., for Stone.

Robert Fickman, Schaffer, Lambright, Odom & Sparks, Houston, Tex. (court-appointed), for Sienhausen.

Douglas Durham, Paula Offenhauser, Kathlyn G. Skyder, Asst. U.S. Attys., and Ronald G. Woods, U.S. Atty., Houston, Tex., for the U.S.

Before BROWN, GARWOOD, and EMILIO M. GARZA, Circuit Judges.

GARWOOD, Circuit Judge:

Defendants-appellants Louis Elton Stone (Stone) and Denise Sienhausen (Sienhausen) were convicted of conspiring to manufacture, and attempting to manufacture, in excess of one hundred grams of methamphetamine. They both appeal, raising various challenges to their convictions. We affirm.

## Facts and Proceedings Below

In July 1989, Stone entered the Scientific Chemical Company in Harris County, Texas and attempted to purchase three pounds of ephedrine, which is used as a precursor chemical in the manufacture of methamphetamine, but was not itself a controlled substance at that time. Scientific Chemical was out of ephedrine, so the salesman took $350 from Stone, told him that he would order the ephedrine, and asked Stone to get back in touch with him in a few days. The salesman also recorded Stone's name, driver's license number, and address, and in accordance with the company's practice of cooperating with the Drug Enforcement Administration (DEA) by reporting purchases of certain chemicals, called Agent Norris Rogers at the DEA office in Houston with this information. After running some checks on Stone, Rogers called the Scientific Chemical salesman back and gave him his pager number, with instructions to give the number to Stone and tell Stone he could call the number to reach someone who could procure ephedrine for him.

Several days later, Stone called Rogers' pager number and told him that he was looking for someone who could provide him with ephedrine. Rogers arranged a meeting with Stone for the following day. At that meeting, on July 21, 1989, Rogers posed as a black market chemical salesman. Stone said that he had customers waiting for methamphetamine, and that he was anxious to supply it because he was in debt to his attorney for representation on a prior arrest for methamphetamine manufacturing. Rogers said that he was making a decent living as a black market chemical salesman, but that his real aspiration was to expand into the more lucrative area of methamphetamine manufacturing, and that he would supply the ephedrine only if Stone would teach him how to cook methamphetamine. Stone agreed. They worked out an arrangement in which Rogers would sell Stone a pound and a half of ephedrine for the $350 Stone had left with Scientific Chemical, and would give Stone another pound and a half in exchange for Stone's teaching him how to cook methamphetamine. Stone told Rogers that, at the suggestion of his girlfriend, he was operating a methamphetamine lab in the attic of her parents' house. Rogers asked him if he had all of the other chemicals and equipment necessary for manufacturing methamphetamine, and Stone said that he did. Stone and Rogers agreed to meet again three days later.

On July 24, they met outside a restaurant in Houston. Rogers was wearing a concealed transmitter in order to record their conversations. Stone told Rogers that there had been a change in plans; he was there to pick up his girlfriend's mother, who was going to be at home that afternoon, making the house unavailable for methamphetamine manufacturing. Stone told Rogers to go to a pay phone and wait for Stone to page him with further instructions. Rogers did so, and a few minutes later Stone called him and told him to meet him at a convenience store. Rogers went there, and Stone arrived shortly thereafter with a woman he introduced as his girlfriend Denise. This woman was later determined to be the defendant Sienhausen. In the back seat of Rogers' car, Stone and Sienhausen began talking about how badly they needed the ephedrine in order to sell some methamphetamine and alleviate their financial problems. They told Rogers that the house would not be available until later that night, after Sienhausen's mother went to bed, but they asked Rogers to go ahead and give them the ephedrine. Stone then suggested that he and Sienhausen leave and conduct the manufacturing on their own, and bring Rogers back part of the finished product. Suspecting that they were trying to cut him out of the operation altogether and would not return with the finished product, Rogers rejected their requests. Stone and Sienhausen therefore agreed to drive him to Sienhausen's parents' house several blocks away.

They arrived at the house and all three entered the garage. Stone and Sienhausen again tried to persuade Rogers to leave the ephedrine with them, but Rogers said that he would not do that until he had seen some lab equipment, so that he could be

sure they actually knew how to manufacture methamphetamine. Stone or Sienhausen said that the lab equipment was under Sienhausen's bed and was inaccessible as long as her mother was up and moving around the house. Rogers then suggested that if Stone would at least write down the formula for manufacturing methamphetamine as proof that he knew how to do it, Rogers would leave and wait until later that night to return. Stone did so, discussing some of the steps as he wrote. During this time, Sienhausen mentioned that both she and Stone knew how to "cook," and that they never stored the lab equipment in one place, so that if either got arrested, the other would be able to continue operations and make some money to get the first one out of jail. Rogers took the recipe written by Stone and gave them about a pound of ephedrine. He left with Stone's promise that they would call him on the pager when they started the manufacturing.

After Rogers left, surveillance agents saw Stone and Sienhausen leave the house. Stone and Sienhausen never called Rogers, and they did not return to the house during the next several days. Two days later, on July 26, the police executed a search warrant on the house. They found no methamphetamine, ephedrine, or lab equipment. On July 27, surveillance was conducted at Stone's residence in Houston. A red truck arrived at the residence, and the officers searched the vehicle and detained the driver, a man named Gary Mock (Mock). In the truck they found Freon and sodium hydroxide, both of which are used in the methamphetamine manufacturing process. On July 31, after learning that a warrant had been issued for their arrest, Stone and Sienhausen turned themselves in.

On August 23, 1989, a two-count indictment was returned against Stone and Sienhausen, charging them with conspiring with each other to manufacture, and aiding and abetting each other in the attempt to manufacture, in excess of 100 grams of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 846, and 18 U.S.C. § 2. A jury found Stone and Sienhausen guilty of both counts. The district court sentenced Stone to concurrent terms of 121 months' imprisonment and 5 years' supervised release on each count, and imposed a special assessment of $50 on each count. Sienhausen was sentenced to concurrent terms of 120 months' imprisonment and 5 years' supervised release on each count, and was also ordered to pay a special assessment of $50 on each count. Stone and Sienhausen both appeal their convictions.

## Discussion

I. Sufficiency of the Evidence for the Conspiracy Convictions

■ In a conspiracy prosecution under 21 U.S.C. § 846, the government must prove beyond a reasonable doubt (1) the existence of an agreement between two or more persons to violate the narcotics laws, (2) that each alleged conspirator knew of the conspiracy and intended to join it, and (3) that each alleged conspirator did participate in the conspiracy. *United States v. Carter*, 953 F.2d 1449, 1454 (5th Cir.1992); *United States v. Harris*, 932 F.2d 1529, 1533 (5th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 270, 116 L.Ed.2d 223 (1991). Stone and Sienhausen contend that the evidence was insufficient to establish that they agreed with each other to manufacture methamphetamine. They point out that in many of the events described at trial, Rogers was the instigator, and they agreed with his suggestions reluctantly if at all. They also point out that they failed to follow through on the incriminating promises that they made to Rogers—*e.g.,* that they would manufacture methamphetamine in the garage on the night of July 24 and that they would allow him to observe the process. Their counsel suggested during opening and closing arguments at trial that they had simply conned Rogers out of the ephedrine, and that no proof of their true intent had been produced.

■ When the sufficiency of the evidence to support a conviction is challenged on appeal, it is not necessary that the evidence exclude every reasonable hypothesis of innocence; we review the evidence in the light most favorable to the government, drawing all reasonable inferences in sup-

port of the verdict, and will affirm the conviction if a rational trier of fact could have found that the evidence established each essential element of the offense beyond a reasonable doubt. *United States v. Vasquez,* 953 F.2d 176, 181 (5th Cir.1992); *United States v. Evans,* 941 F.2d 267, 271 (5th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 451, 116 L.Ed.2d 468 (1991). In this case, the evidence was clearly sufficient to permit the jury to reach a verdict of guilty. Stone and Sienhausen's statements to Rogers, if believed, are more than adequate to establish an agreement between the two of them to violate the narcotics laws, and given their purchase of ephedrine and other circumstances, it was within the province of the jury to accept Stone and Sienhausen's own account of their plan. Stone's ability to write down a recipe and a fairly detailed set of instructions for the manufacturing process—which a DEA chemist confirmed at trial to be correct—demonstrated that their professions to be familiar with methamphetamine manufacturing were not a complete falsehood. The possibility that they may have misled Rogers about some particulars, such as the location of the lab equipment, or never intended to allow him to observe or share in the proceeds of the methamphetamine manufacture, does not compel a reasonable doubt about their purpose in acquiring the ephedrine.[1]

## II. Identification of Sienhausen at Trial

■ Sienhausen contends that the evidence is insufficient to support her convictions because the record fails to reflect that she is the person described in Rogers' testimony. On direct examination, in describing his meeting with Stone on the afternoon of July 24, 1989 and his initial introduction to Sienhausen, Rogers testified as follows:

> "A. He [Stone] called her Denise, and he said that she was his girlfriend.
>
> "Q. Okay. Did he introduce her to you?
>
> "A. Yes.
>
> "Q. Okay. And is she here in the courtroom?
>
> "A. Yes, sir.
>
> "Q. Would you identify her for the jury?
>
> "A. She's the lady sitting next to—at the first table next to the defense attorney. She has on a yellow sweater and a green, lime green turtleneck. And she has sort of blondish hair."

There is no challenge made here to Rogers' recollection or ability to identify the woman involved in the events of July 24, 1989. The sole basis for Sienhausen's point of error is that, because the prosecutor did not at the end of this exchange expressly request that the trial transcript reflect that Rogers had identified the defendant— which he clearly should have done—there is no way in examining the record on appeal to know whether she was in fact the woman in the lime green turtleneck.

We find this challenge, raised for the first time on appeal, creative but unavailing. As the above testimony shows, there can be no doubt that Rogers identified the person whom he was discussing with adequate specificity for the jury and others present in the courtroom. During *voir dire* Sienhausen was present in court and was personally identified before the entire

---

1. Through a supplemental submission to this Court, Stone calls our attention to the recent Second Circuit case of *United States v. Perrone,* 936 F.2d 1403 (2d Cir.), *clarified,* 949 F.2d 36 (2d Cir.1991). In reliance on that decision, he argues that it was error for the district court to convict and sentence him under 21 U.S.C. § 841(a) rather than under section 841(d). We find this argument to be without merit. The concern expressed by the *Perrone* Court in its original opinion was that the *only* evidence against Perrone was his possession of chemicals under circumstances indicating he knew or should have known that they would be used to manufacture a controlled substance—conduct that Congress intended to punish under section 841(d)—and that to convict him under section 841(a) based solely on that conduct would thwart the statutory scheme. *See id.* at 1415. Even if the case can still be cited for that proposition after the court's clarification, that concern does not apply in the present case. The basis for Stone's conviction under section 841(a) was not merely his possession of ephedrine; it was his numerous expressions of intent to manufacture methamphetamine. The same is true of Sienhausen.

panel by the Assistant United States Attorney and by her counsel as the defendant Denise Sienhausen, and Sienhausen personally pleaded not guilty in the presence of the jury. Absent some genuine issue as to the identity of the person who committed the offense, we are not inclined to reverse a conviction based on such a technicality in the appellate record.

### III. Constructive Amendment of the Indictment

Stone and Sienhausen contend that the jury instructions allowed the jury to convict them based on an agreement to manufacture not charged in the indictment—namely, a supposed agreement with undercover agent Rogers. They also suggest that the jury could have convicted them based on an agreement with Mock. This too, they assert, would represent a constructive amendment of the indictment, Count One of which alleged that Stone and Sienhausen "did knowingly and unlawfully agree, conspire and confederate between themselves to manufacture" methamphetamine.

We find no basis for this argument. The jurors were given a copy of the indictment to use during their deliberations, and in instructing the jury on the essential elements of the offense that the government was required to prove, the court repeated the indictment's language quoted above. In addition, the instructions included a reminder that the jurors should first determine "whether or not the conspiracy existed *as charged*" (emphasis added). As discussed in Part I, there was ample evidence from which the jury could have concluded that Stone and Sienhausen agreed with each other to manufacture methamphetamine; we have been shown no reason to assume that the jury disregarded its instructions and based its guilty verdict on a different agreement. *Accord, United States v. Lokey,* 945 F.2d 825, 831–32 (5th Cir.1991).

### IV. Refusal to Give Requested Jury Instruction

Stone and Sienhausen's fourth point of error is that the district court erred in refusing to give to the jury their proposed instruction setting out their theory of the case. The instruction read:

"It is the Defendant's theory that they did not unite to commit a crime. That is to say, while they stated they were planning on manufacturing methamphetamine, their statements were not an accurate reflection of their true intent. The Defendants contend that they had no agreement with each other to manufacture methamphetamine. In determining the kind of agreement or understanding that existed as to each Defendant, unless you find beyond a reasonable doubt that the agreement or understanding reached by a Defendant actually contemplated manufacturing methamphetamine, you will find that Defendant not guilty."

Relying on *United States v. Kim,* 884 F.2d 189, 193 (5th Cir.1989), they argue that a defendant is entitled to have the jury instructed on a theory of the defense for which there is any foundation in the evidence.

■ Initially, we observe that, as this Court clarified in its opinion denying rehearing in *United States v. Stowell,* 947 F.2d 1251 (5th Cir.1991), *reh'g denied,* 953 F.2d 188 (5th Cir.) (per curiam), *cert. denied,* —— U.S. ——, 112 S.Ct. 1269, 117 L.Ed.2d 497 (1992), the defendants' contention is not a completely accurate statement of the law; in order for a defendant to be entitled to an instruction, "any evidence in support of a defensive theory must be sufficient for a reasonable jury to rule in favor of the defendant on that theory." 953 F.2d at 189.

■ However, defendants' argument fails here for the separate reason that their "theory" amounts to little more than suggesting the nonexistence of one of the essential elements of the offense (criminal intent underlying their agreement).[2] The

---

**2.** We also note that defendants' request here seeks to place before the jury a defensive theory not affirmatively raised by the evidence. Neither defendant presented any evidence at trial and none of the government's evidence reflected that defendants did not intend to manufacture

refusal to give a requested jury instruction constitutes reversible error if the instruction (1) was substantially correct, (2) was not substantially covered in the charge given to the jury, and (3) concerned an important issue so that the failure to give it seriously impaired the defendant's ability to present a given defense. *United States v. Allison,* 953 F.2d 870, 876 (5th Cir.1992); *United States v. Terrazas–Carrasco,* 861 F.2d 93, 95 (5th Cir.1988). Here, the jury instructions fully set forth the requirements that Stone and Sienhausen must have genuinely reached an agreement or understanding, and that that agreement must have contemplated commission of the offense charged in the indictment.[3] The jury was also cautioned that mere presence at the scene of a transaction and mere similarity of conduct would not necessarily constitute proof of a conspiracy. Because the elements of agreement and intent—as well as the legal defenses based on lack of agreement—were substantially covered in the charge given to the jury, a theory of the defense that merely recounted the facts without those elements was not required. *See United States v. Lance,* 853 F.2d 1177, 1184–85 (5th Cir.1988); *United States v. Barham,* 595 F.2d 231, 244–45 (5th Cir. 1979).

V. **Sufficiency of the Evidence to Support Convictions for Aiding and Abetting an Attempt to Manufacture Methamphetamine**

■ Stone and Sienhausen next challenge the sufficiency of the evidence to support their convictions for attempt to manufacture methamphetamine, aided and abetted by each other. To be convicted of attempt under 21 U.S.C. § 846, a defendant "must have been acting with the kind of culpability otherwise required for the commission of the crime which he is charged with attempting," and "must have engaged in conduct which constitutes a substantial step toward commission of the crime," *i.e.,* conduct "strongly corroborative of the firmness of the defendant's criminal intent." *United States v. Mandujano,* 499 F.2d 370, 376 (5th Cir.1974), *cert. denied,* 419 U.S. 1114, 95 S.Ct. 792, 42 L.Ed.2d 812 (1975). To have aided and abetted a crime within the meaning of 18 U.S.C. § 2, a defendant must have (1) associated with the criminal venture, (2) participated in the venture, and (3) sought by action to make the venture succeed. *United States v. Gallo,* 927 F.2d 815, 822 (5th Cir.1991).

■ Sienhausen argues that, because Rogers admitted that he never saw any evidence of a manufacturing lab at her parents' house, and because there was no testimony as to what happened to the ephedrine after Rogers left the house, no rational trier of fact could have convicted Stone and her of attempt to manufacture methamphetamine. Stone argues more particularly that, viewed objectively, his conduct cannot amount to a "substantial step." We disagree. Stone's purchase of a precursor chemical from a purported black market salesman, while declaring a plan to use the chemical to manufacture methamphetamine and furnishing the salesman an accurate explanation of how to do so, was an act which, "without any reliance on the accompanying *mens rea,* mark[s] the defendant's conduct as criminal in nature." *United States v. Oviedo,* 525 F.2d 881, 885 (5th Cir.1976). Although there may be some ambiguity over what

---

methamphetamine; defense counsel's suggestions during opening statements and argument and in his questions of Rogers on cross-examination are the only sources of that theory.

**3.** The jury was instructed that they must be able to find beyond a reasonable doubt from the evidence:

"(1) That two or more persons in some way or manner, positively or tacitly, came to a mutual understanding to try to accomplish a common and unlawful plan, as charged in the indictment;

"(2) That the Defendant knowingly or intentionally became a member of such conspiracy."

The jury was additionally told that in order to convict they must find beyond a reasonable doubt that "Louis Elton Stone and Denise Sienhausen did knowingly and unlawfully agree, conspire or confederate between themselves to manufacture in excess of one hundred grams of methamphetamine."

precisely Stone and Sienhausen intended to do—*i.e.*, whether they actually had a laboratory set up in Sienhausen's parents' house and sincerely intended to allow Rogers to observe, or whether they had an operation elsewhere and never intended to include Rogers—the purchase of the ephedrine was clearly a significant enough step toward that end to corroborate the firmness of their intent to carry out their plan, and (as discussed *supra* in Parts I and III) it was permissible for the jury to conclude that their objective was that described in the indictment. Moreover, a jury could rationally conclude that by making her parents' house available for the manufacturing operations themselves, or even merely for the dealings with Rogers that led to procurement of the ephedrine, Sienhausen participated in the venture and sought by action to make it succeed.

## VI. Failure to Properly Instruct the Jury on the Law of Attempt

Stone and Sienhausen's next contention is that the district court's instruction to the jury on the offense of attempt to manufacture methamphetamine was inadequate because it failed to require that they have taken a "substantial step" toward commission of the offense. The court instructed the jury that "[t]o attempt to commit an offense means merely to willfully do some act in an effort to bring about or accomplish something the law forbids." The defendants did not object to the instruction below, so we will reverse only if the instruction constituted plain error, *i.e.*, if "considering the entire charge and evidence presented against the defendant, there is a likelihood of a grave miscarriage of justice." *United States v. Sellers*, 926 F.2d 410, 417 (5th Cir.1991).

▌ Stone and Sienhausen are correct that the instruction at least inadequately described the second element of the offense as set forth in *Mandujano* (*see* Part V, *supra*). When a jury instruction

omits or significantly misstates an essential element of an offense, the error may be severe enough to meet the plain-error standard. *See, e.g., United States v. Flitcraft,* 803 F.2d 184, 186–87 (5th Cir.1986). Recently, however, this Court confronted a very similar instruction to the present one and concluded that, in light of the evidence in the case, it did not rise to the level of plain error. *See United States v. Contreras,* 950 F.2d 232, 239–40 (5th Cir.1991), *petition for cert. filed* (3–20–92). We find the same to be true here. Although the defect in the instruction given here may even have been, because of the inclusion of the word "merely," [4] slightly greater than the one at issue in *Contreras,* we are not persuaded that under the circumstances of this case—where the contest as argued below was more whether the plan entertained by the defendants was the crime charged in the indictment than whether they took a substantial step toward effectuation of their plan—"it could have meant the difference between acquittal and conviction." *Id.* at 240.[5] Also weighing against a finding that the defective instruction could have resulted in a grave miscarriage of justice for these defendants is the fact that they received identical concurrent sentences on the conspiracy charges; the imposition of the additional $50 special assessments were the only consequence of the convictions for attempt.

## VII. Admission of Audio Tapes and Use of Written Transcripts

During the investigation, the government made five tapes of Rogers' conversations with Stone or with Stone and Sienhausen together. The first three were taped from telephone conversations and were clear recordings. The fourth and fifth tapes were made on July 24, when Rogers wore a concealed transmitter to his meetings with Stone and Sienhausen. The tapes were made by a second DEA agent, Alton Lewis (Lewis), who carried the receiver in his

---

**4.** This wording is not focused on in the appellate briefs of either defendant.

**5.** *Cf. Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 552, 98 L.Ed.2d 568 (1988); *Wain-*

*wright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 853 & n. 11, 83 L.Ed.2d 841 (1985) (absence of objection, even where not a waiver, may reflect posture and understanding of trial participants).

vehicle and followed Rogers from the restaurant to the convenience store and then to Sienhausen's parents' house. A heavy thunderstorm during this time interfered with the reception, and large portions of the tapes are very difficult to understand. Rogers prepared written transcripts of the fourth and fifth tapes.

Prior to trial, the defendants contended that the fourth and fifth tapes were unintelligible, and that to allow the jury to consider typed transcripts of the tapes would constitute unauthorized bolstering of the evidence contained on the tapes. The defendants objected to use of the transcripts for this reason, and in a separate motion asked that the district court conduct a hearing outside the jury's presence prior to admitting any transcripts in order to determine their accuracy. At a pretrial hearing, the court ruled that the transcripts could not be admitted into evidence or taken to the jury room during deliberations, but could merely be used as a potential guide for the jury while the tapes were being played. The court found no need to rule on defendants' further request that it hold a hearing to determine the accuracy of the transcripts, because that motion merely requested such a hearing before the transcripts were admitted into evidence. The defendants then promptly filed written motions requesting that the government be prohibited from using the transcripts before the jury at all.

Immediately prior to trial, the district court indicated that it had listened to one tape and reviewed the transcript, and that the defendants' objection to use of the transcript as a potential guide for the jury was overruled. During the same conference, counsel for the government notified the court that it had that morning submitted revised versions of the transcripts for the fourth and fifth tapes, which were essentially the same but contained some typographical corrections. Defense counsel did not renew its motion that the court compare the tapes to the new transcripts.

At the end of the first day of trial, the district court admitted the tapes into evidence over defendants' objection that they were of such poor quality that they would mislead the jury. On the second day of trial, the district court allowed the government to play the fourth and fifth tapes for the jury and to submit the transcripts to the jury to be used as potential guides while the tapes were playing. The defendants renewed their objection to use of the transcripts, and the court again overruled the objection, noting that from its review it had concluded that the tape was not so unintelligible that someone familiar with the conversation could not make an accurate transcript. The court instructed the jury that the transcripts had been prepared by the government's agent, and cautioned the jury as follows:

"Now, this [transcript] is only for your general guidance. You are directed and ordered by this Court to make your own interpretation of what you hear from that tape. This is only what the Government believes on this tape. And if you feel it's unintelligible, then you are to disregard anything that you feel is unintelligible, notwithstanding what the Government has down as to what its position is on that tape.

"So, in effect, I will let you consider this just as—well, just as a transcript as far as the Government's version is concerned. The defense in no way adopts this version.... However, it's my decision to allow you to use it for whatever weight, if any, you desire to give to it. If you feel that tape is unintelligible, then disregard what the Government thinks is on that tape. And if you listen and you hear it differently from what is down here, you ought to consider what you hear as best you can from the tape."

The court further stated: "It [the transcript] is not evidence in this case. The tape is the evidence."

In this appeal, Stone and Sienhausen make three distinct challenges regarding the tapes and transcripts: (1) that the government failed to establish the predicate for admission of the tapes; (2) that the tapes' unintelligibility rendered the district court's admission of the tapes an abuse of discretion; and (3) that the district court compounded its error by wrongfully allow-

ing use of the transcripts and restricting cross-examination of Rogers about the transcripts.

On Stone and Sienhausen's first point, the guiding principles for this Circuit were set forth in *United States v. Biggins*, 551 F.2d 64 (1977). There the Court held that when seeking to introduce a recording in a criminal prosecution, the government bears the burden of "going forward with foundation evidence demonstrating that the recording as played is an accurate reproduction of relevant sounds previously audited by a witness," which generally requires the government to demonstrate (1) the competency of the operator, (2) the fidelity of the recording equipment, (3) the absence of material deletions, additions, or alterations, and (4) the identification of the relevant speakers. *Id.* at 66. The *Biggins* Court further held that although strict compliance with the government's particularized burden is "the preferred method of proceeding," even in the absence of such compliance, the trial judge retains broad discretion to independently determine that the recording accurately reproduces the auditory experience. *Id.* at 66–67.

■ In the present case, prior to admission of the tapes, Rogers testified that they were the tapes of his conversations with Stone and Sienhausen, that they had been recorded by Lewis while Rogers was talking with the defendants and wearing a hidden transmitter, that they had been kept in a secure place from the time they were made, and that no alterations had been made. Later, after the tapes had been played for the jury, Lewis testified and went into a little more detail about the recording equipment and its capabilities. He admitted that the thunderstorm reduced the transmitter's effective range, and that at times he had not been able to stay close enough to Rogers to make an intelligible recording.

We conclude that the government adequately laid a foundation for the tapes under *Biggins*. Although not all of the *Biggins* factors were thoroughly covered before the tapes were played, the *Biggins* decision indicates that the list is not meant to command "formalistic adherence" at the expense of the district court's discretion. *Id.* at 67. We perceive no abuse of that discretion here, particularly since the essence of the defendants' opposition to the tapes at trial was not really an authentication issue. The defendants did not contend that the government had not adequately established the content of the tapes to make them admissible, *i.e.*, the defendants did not challenge the means by which the tapes were prepared or suggest alteration or distortion of the tapes, but instead simply questioned the usefulness of the final product (and did this for the first time during the trial itself).

■ On the defendants' second contention regarding the tapes, this Court has consistently held that poor quality and partial unintelligibility do not render tapes inadmissible unless the unintelligible portions are so substantial as to render the recording as a whole untrustworthy, and that this determination is left to the sound discretion of the trial judge. *United States v. Ruppel*, 666 F.2d 261, 272 (5th Cir.Unit A), *cert. denied*, 458 U.S. 1107, 102 S.Ct. 3487, 73 L.Ed.2d 1369 (1982); *United States v. Sutherland*, 656 F.2d 1181, 1200 (5th Cir. Unit A 1981), *cert. denied*, 455 U.S. 949, 102 S.Ct. 1451, 71 L.Ed.2d 663 (1982); *United States v. Llinas*, 603 F.2d 506, 508 (5th Cir.1979), *cert. denied*, 444 U.S. 1079, 100 S.Ct. 1030, 62 L.Ed.2d 762 (1980). We find no abuse of discretion in the admission of the tapes here, particularly given the precautions taken by the court when they were played. *Accord Ruppel*, 666 F.2d at 272.

■ Finally, on Stone and Sienhausen's third point, this Circuit's guidelines for use of transcripts were set out in *United States v. Onori*, 535 F.2d 938, 946–49 (5th Cir.1976). In *Onori*, this Court held that transcripts given to the jury are evidence, admitted for a limited purpose, and that therefore a determination of the transcript's accuracy is typically a jury function rather than a judicial one constituting a precondition to admission. *Id.* at 947–48. The *Onori* Court indicated that the preferred procedure was to have the parties arrive at a "stipulated" transcript to be given to the jury; if the parties cannot

agree on all portions of the transcript, then the transcript may contain both versions of the disputed portions, or the court may give two transcripts to the jury. *Id.* at 948–49. The *Onori* Court, consistent with its classification of the accuracy of a transcript as basically a factual determination, held that the defendants in that case, having been offered the opportunity to present their own version of the transcript and to have their expert witness testify as to errors in the government's, had not shown reversible error in the district court's refusal to rule on the accuracy of the government's transcript before giving it to the jury. *Id.* at 949. We have likewise held that when a defendant challenges the government's translation of a foreign-language conversation for the jury, but fails to offer his own translation, the district court is under no obligation to pass on the transcript's accuracy. *United States v. Armendariz–Mata,* 949 F.2d 151, 156 (5th Cir.1991); *Llinas,* 603 F.2d at 509–10.

The situation of Stone and Sienhausen was in some ways distinct from the situation contemplated in *Onori. Onori* described an instance in which the defendants alleged specific errors in the government's transcript. *See Onori,* 535 F.2d at 948. Almost by necessity, a challenge to a translation by the government will similarly concern specific defects. In the present case, however, the defendants' contention was that so much of the tape was unintelligible that no reliable transcript could be made. To place upon them the burden of coming forward with their own transcript would be to require of them what they contended could not be done. Therefore, *Onori* alone would not provide authority for admission of the transcript in this case without a finding of the transcript's accuracy.[6]

However, the district court in this case went considerably beyond the minimum procedure set forth in *Onori.* At the beginning of trial, the district court had before it the defendants' motion to make an *in camera* determination of the accuracy of the government's transcripts, and, if it found them to be inaccurate, to suppress them.[7] In the conference immediately prior to the beginning of trial, the judge informed counsel that he had listened to the tape given him and had read the transcript, and that he was denying the motion to suppress the transcript. He indicated, though, that the jury would receive a thorough instruction as to the weight to give the transcript. On the second day of trial, when the defendants renewed their objection as the tapes were about to be played, the district court stated: "I listened to the tape myself, compared it to the transcript, and it was my determination that it is not so unintelligible that someone familiar with the transaction could not have made a transcript that was just for the jury's consideration."[8] The defendants did not request a more specific finding as to the accuracy of the transcript.

We conclude that the district court's handling of the situation was within its discretion. Its finding that a reliable transcript

6. Although *United States v. Mendoza,* 574 F.2d 1373, 1378–79 (5th Cir.), *cert. denied,* 439 U.S. 988, 99 S.Ct. 584, 58 L.Ed.2d 661 (1978), arguably presented a similar situation, the opinion in that case reflects only that the defendants argued that the government's transcript was inaccurate; it does not reveal whether they argued that no accurate transcript could be made.

7. Again, Stone and Sienhausen do not raise an *authentication* issue as such. That is, they do not claim that the government failed to meet its initial burden of introducing testimony by the person who prepared the transcripts stating that they were accurate reproductions of the taped conversation. *See Sutherland,* 656 F.2d at 1201 & n. 16. Rogers testified that he prepared and reread the transcripts, and that he had made them as accurate as possible given the quality of the tapes.

8. As noted above, at the pretrial hearing the district court found it unnecessary to consider the defendants' first motion for the court to assess the accuracy of the transcripts before admitting them into evidence, because in the district court's view the transcripts would not be admitted into evidence, only used as a guide for the jury while the tapes were being played. Although this broad, categorical distinction is one that has been rejected by this Circuit's decisions, *see Onori,* 535 F.2d at 947; *Sutherland,* 656 F.2d at 1200 n. 15, any possible error in this ruling was rendered harmless by the court's consideration of the defendant's second motion and subsequent willingness to compare the transcript to the tape.

could have been made by someone familiar with the conversation was a direct consideration and rejection of the objection raised by the defendants, and put the case back into the posture contemplated in *Onori:* it was the province of the jury to decide whether the government's transcript was accurate, and the obligation of the defendants to raise specific challenges to the transcript before the jury.[9] Moreover, the district court gave a thorough limiting instruction to the jury, which the *Onori* decision indicates is "the key to protecting a defendant's rights in this situation." *Onori,* 535 F.2d at 949. The defendants argue to this Court that the district court listened to only one of the two disputed tapes and never made any specific findings about accuracy. However, the trial transcript reveals no request by the defendants for either of these steps.[10]

VIII. Lack of Effective Assistance of Counsel

 Stone finally contends that he was denied his Sixth Amendment right to counsel. He makes the following arguments in support of his position: (1) that the district court refused to allow his trial counsel to withdraw in the face of a clear conflict of interest; (2) that the district court's scheduling interfered with the representation by his new trial counsel (who represented Stone jointly with the initial attorney); (3) that the district court interfered with his counsel's cross-examination at various points in the trial; (4) that the prosecutor made an improper remark about defense counsel during closing argument to which defense counsel failed to object; (5)

that defense counsel blundered in introducing the evidence about Mock, because that evidence enabled the government to elicit testimony that the police had previously seized a methamphetamine lab from Stone's address.

Several of these complaints—such as the scheduling issue and the alleged interference with cross-examination—are not in reality claims based on ineffective assistance of counsel; if Stone cannot identify error in the district court's scheduling or evidentiary rulings themselves, then whatever disadvantage they caused him was not attributable to counsel. Nor do we perceive any reversible error in the district court's rulings referenced in (2) and (3) above or in the prosecutor's comment referenced in (4) above. Ineffective assistance of counsel was not raised below, so even the points that are genuine claims of this nature are not properly reviewable on this direct appeal. *See United States v. Armendariz-Mata,* 949 F.2d 151, 156 (5th Cir.1991); *United States v. Higdon,* 832 F.2d 312, 313–14 (5th Cir.1987), *cert. denied,* 484 U.S. 1075, 108 S.Ct. 1051, 98 L.Ed.2d 1013 (1988).[11]

### Conclusion

Because we find no reversible error presented by any of Stone and Sienhausen's contentions, the judgment of the district court is

AFFIRMED.

---

9. Stone and Sienhausen's claim that the district court unduly interfered with cross-examination of Rogers is based on the same issue discussed in note 8: the district court's arguable misuse of terminology in stating that the transcripts had not been admitted into evidence. The district court allowed defense counsel to question Rogers about the conversation as reflected in the transcript, but would not allow him to direct Rogers to a specific line and sentence in the transcript to cross-examine him about that statement, because the transcript was not "in evidence." No error is presented by this ruling, however, since imposition of a restriction such as this one is consistent with the "limited purpose" admission contemplated by *Onori.*

10. Indeed, the district court indicated that it had listened to the only tape provided to it with the defendants' motion, and the defendants made no further request or offer to supply the other tape.

11. As to complaints of ineffective assistance of counsel (other than those referenced in (2), (3), and (4) above), our affirmance is without prejudice to same being appropriately pursued in a proper and timely proceeding under 28 U.S.C. § 2255.