UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 90-2660

_____

UNITED STATES of AMERICA

Plaintiff-Appellee,

v.

MARIO V. MENESSES, Jr., DANNY PINEDA BARRETO and HAROLD BRATOVICH

Defendants-Appellants.

_____
Appeals from the United States District Court
for the Southern District of Texas
_____
(May 22, 1992)


Before POLITZ, Chief Judge, GARZA, Reynaldo G., and WIENER, Circuit Judges.

GARZA, Reynaldo G., Circuit Judge:


PROCEDURAL HISTORY

On November 29, 1989, an indictment was filed in the United States District Court for the Southern District of Texas charging six individuals with violations of federal narcotics laws. The indictment alleged that Soto Angel Andrade, a/k/a Julian Rivera

("Andrade"), Mario Menesses, Harold Bratovich, Carlos Alberto Alegria-Moreno ("Alegria"), Danny Pineda Barreto ("Barreto"), and Frank David Barreto ("Frank Barreto"),[1] conspired with intent to distribute in excess of five kilograms of cocaine (Count One) and aided and abetted one another in the possession with intent to distribute in excess of five kilograms of cocaine (Count Two), in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846. The Appellants pleaded not guilty to all charges. Trial by jury commenced on April 24, 1990 and concluded two days later with verdicts of guilty on all counts.

On July 13, 1990, the district court imposed sentence. Barreto was remanded to the custody of the Attorney General for concurrent 235 month terms of confinement which were to be followed by concurrent five year terms of supervised release. Bratovich was sentenced to concurrent 200 month terms of confinement and concurrent five year terms of supervised release. The district court sentenced Menesses to serve concurrent 420 month terms of confinement to be followed by five year terms of supervised release. All were ordered to pay the mandatory special assessment of $100.

These appeals followed.

## FACTS

We review the facts in the light most favorable to the jury verdict. <u>Glasser v. United States</u>, 315 U.S. 60, 80 (1942). The

---

[1]     Danny Barreto is Frank Barreto's wife.

2

indictment returned against Appellants was the end result of a sting operation in which agents of the Federal Bureau of Investigation ("FBI") attempted to infiltrate and target Colombian suppliers of large quantities of cocaine. Specifically, Ishmael Beltran was viewed as being in charge of a major Colombian cocaine exporting organization. FBI agent Enrique Mercadal testified that a "cooperating witness," Raphael Gonzales, introduced him as a cocaine smuggler to Beltran via telephone sometime in June, 1989. They led Beltran to believe that Mercadal and Gonzales were partners.

On August 1, 1989, Mercadal received a telephone call from co-defendant Alegria who stated that he was calling on behalf of Beltran in regards to a 500 kilo shipment. Mercadal, however, failed to deliver the cocaine to Alegria; instead telling him that his smuggling operation had encountered difficulties. Although Alegria never received the cocaine, he continued to contact Mercadal. Beltran made arrangements for Mercadal's organization to transport a load of cocaine from Colombia to Houston. Beltran and Alegria were under the impression that Mercadal's organization handled the cocaine from the moment that it left Colombia. In fact, the FBI used a Mexican smuggling ring that was unaware that this was a sting operation. The Mexican smugglers were to bring the cocaine to El Paso, where Mercadal would take control of it. The smugglers, however, were late in arriving.

Mercadal stalled Alegria until October 3, 1989, when he received a telephone call from an individual who identified himself

3

as "Julian Rivera," later identified as Andrade. Andrade related that he was Beltran's personal envoy and that he had been dispatched to Miami to look into the delays affecting the shipment from El Paso. Mercadal told him that the watchword of his organization was caution and that if he wanted the job done right, Beltran would have to be patient. Alegria and Andrade telephoned Mercadal daily until October 17, 1989, when a conference was called at a Miami restaurant where Andrade told Mercadal that if the delivery did not occur shortly, "blood would flow."

Finally, Mercadal heard that delivery in El Paso was imminent. He informed Andrade and reserved a room for him at a Ramada Inn in Houston. Mercadal then learned that there would be another delay. He telephoned Andrade, who had already left and had returned to Miami. Mercadal then called Andrade in Miami. Andrade said that he had spotted surveillance in Houston and had left so as not to jeopardize the operation.

Finally, the shipment reached El Paso. Mercadal led Andrade and Alegria to believe that Mercadal was transporting it overland to Houston. Actually, the FBI flew it there. Andrade was staying at the Grand Hotel, and Mercadal telephoned him on November 15th to tell him that the delivery would take place the next day. That night, at dinner, Mercadal told Andrade that he would need $250,000 to pay his people. Despite the fact that the cocaine had a street value of $3,000,000, Andrade hesitated and said that only Beltran could authorize such a disbursement.

The following morning, Mercadal, Andrade and Alegria spoke via

telephone. They argued further about the money. Andrade said he was there solely to receive the merchandise and that Alegria was responsible for paying for the transportation. Mercadal pressed for an answer on how soon he would be paid. Andrade said that he would have to examine the cocaine and that would take at least an hour, and that Alegria would pay Mercadal shortly thereafter.

At 11:55 a.m., Mercadal called Andrade and told him that the delivery would take place in one hour at the Two Pesos Restaurant. Meanwhile, FBI agents were loading the cocaine into a rented PENSKE truck. Between 1:30 and 2:00 p.m., Andrade entered the restaurant where Mercadal and his FBI associate Mark Suarez were waiting. Menesses, who was previously unknown to Mercadal, accompanied Andrade. After engaging in shop talk regarding the pitfalls of transporting cocaine across the border, Mercadal handed the keys to the PENSKE to Andrade.

Mercadal made one more phone call to Alegria, asking when he would be paid. Alegria answered that once the shipment was verified, he would call Mercadal.

Meanwhile, FBI agent Dale Rivett had been circling the area in a Cessna aircraft. He had observed two men exit the Two Pesos and get into a white compact pickup truck. The truck drove across the street to where the PENSKE was parked. The truck drove past the PENSKE and circled the parking lot. The truck then left the parking lot and drove to a nearby Circle K, where one man exited the truck, returned to the PENSKE, walked around it, and returned to the truck. Another FBI observer identified this man as Andrade.

5

A Mustang automobile then pulled up behind the truck and the man who had just surveyed the PENSKE walked to the passenger side and appeared to speak with someone in the car. Both Andrade and Menesses then walked back to the PENSKE and drove off in it, followed by the Mustang. The Mustang continued to follow the PENSKE until it came to a subdivision where the PENSKE turned. The Mustang continued past the subdivision.

About 2:39 p.m., the PENSKE came to a stop at a house which FBI agent Douglas John Hanson identified as 9015 Brookwolf as he walked past it. Menesses and Andrade drove off in the PENSKE an hour and twenty minutes later and stopped at a transmission shop off Highway 290 where they unloaded the cocaine. The PENSKE then drove off to a small shopping center where the FBI arrested Andrade and Menesses.

FBI agents had continued to observe the Mustang, which drove over to 1819 Bingle. Special Agent Phil Armand observed Bratovich exit on the driver's side and Alegria exit on the passenger's side. The two walked over to a transmission shop on the property. A Nissan automobile pulled up some two hours later. Alegria came from the shop and got in the Nissan. The Nissan proceeded on Bingle to where it became Voss and turned onto Westheimer. The Nissan driver suddenly moved from the middle lane into the left lane, made a sharp U-turn, and started back toward Voss. Travelling quickly through heavy traffic, the Nissan cut past a bus on Westheimer and turned sharply onto Voss.

On Voss, the Nissan became entangled in traffic and the FBI

chase vehicle, which had by now flashed warning lights, overtook the suspect vehicle and pulled it over. The agents arrested its passenger, Alegria, and the driver, Ettore Bratovich, Harold Bratovich's brother. A pager was found on the passenger floorboard. The number to the pager corresponded to the one used by Mercadal to contact Alegria.

The agents then returned to the Bingle property and arrested Harold Bratovich, who did not resist arrest. The agents found no drugs, weapons, beepers or drug paraphernalia on Bratovich or, apparently, at the Bingle location. The agents then secured warrants for a search of the Brookwolf premises, which proved more successful. The house was the residence of Frank and Danny Barreto. Frank owned the aforementioned transmission shop, Texas Transmission, where the agents had located the specially constructed pallet in which the cocaine had been secreted on board the PENSKE. The agents found the cocaine, which had been removed by the time the agents found the pallet, at the Barreto residence. Also at the Barreto residence, the agents found laboratory equipment of the type used in making "crack" cocaine, weapons and large sums of cash. The agents arrested the Barretos.

The FBI had summoned Special Agent James R. Garcia to its Houston office to interview Danny Barreto and Menesses in Spanish. Garcia informed Barreto of her rights according to Miranda v. Arizona, 384 U.S. 436 (1964), using a special form. She was apparently distraught and refused to sign it and thus indicate in written form that she understood her rights. She nonetheless

7

indicated that she did understand them and agreed to talk to Garcia.

Barreto told Garcia, who had not previously been involved in the investigation and was unaware of the facts, that agents had arrested her in her home and had seized 160 kilograms[2] of cocaine. She said that she had met someone at a nightclub frequented by Colombians and that she had offered her house to him as a drop site. She stressed that she, and she alone, was responsible for the presence of the cocaine at her house, and that her husband was not involved. Barreto stated that she desperately needed money, and that the $72,000 in cash seized at her home represented the proceeds of a four-kilo sale. Barreto observed that the cocaine had been brought to her house in a truck remarkably similar to the one parked outside the FBI's offices.

Garcia interviewed Menesses, who had initiated contact with his captors, at the Harris County jail. Garcia first advised Menesses of his constitutional rights and verified his desire to waive them and to submit to an interview. Menesses related that he had joined the operation in June of 1989. In late October, he was instructed to procure transportation, hotel rooms, and a storage site. He was also told to acquire a pager. A person that he met offered a house as a storage site. On November 16th, Menesses received the drugs from some "Mexicans." The contraband's owner told Menesses that the Mexicans had stolen some of the shipment.

---

[2] The FBI agents had secreted 163 kilograms of cocaine in the PENSKE.

8

The government concluded its testimony by offering evidence of two extrinsic offenses, one against Bratovich and the other against Alegria. Over Bratovich's objection, Drug Enforcement Administration Agent D.A. Norton testified that on July 7, 1988, he consummated a one kilogram cocaine purchase with one Daren Hightower at a parking lot of the Houston Intercontinental Airport. Bratovich was with Hightower when Norton exited his flight and walked with the two while they discussed the sale. According to Norton, Bratovich appeared nervous and stated "Daren, let's don't talk about it here." Norton explained that after Hightower expressed a desire not to close the transaction at the airport, Bratovich said "Daren, let's quit talking about it. Everything's fine. Let's do it as we'd planned. Let's go ahead with it. Everything's O.K." Hightower and Norton ultimately went to the parking lot where Norton was given the opportunity to see the kilogram in the trunk of a vehicle. Hightower was then placed under arrest. Bratovich had remained inside the airport where he was subsequently arrested. At the time of trial the charge was still pending against Bratovich. Norton acknowledged outside the presence of the jury that he never made arrangements or negotiated for the purchase of the contraband with Bratovich.

While Bratovich objected to the introduction of this evidence at trial, he does not now raise it as a point of error. Whether this extrinsic act occured as related by Norton and was in fact a crime is for another tribunal to decide. We note, as did the trial judge in the case under review in his jury instruction, that the

9

jury could use this act only to judge intent and knowledge. It would be impermissible for the jury to use it for the purpose of deciding that Bratovich is possessed of a bad character and could be expected to behave in conformity therewith. See Fed.R.Civ.P. 404(b). We note also that no other alleged coconspirator in the case under review was implicated in the extrinsic offense.

The defendants all rested behind the government save Bratovich. Ettore Bratovich testified in his brother's behalf and explained the circumstances that led to his arrest on Voss while chauffeuring Alegria. Bratovich also testified and disavowed any knowledge of the cocaine conspiracy. He explained that he was a victim of circumstance merely doing a favor for Alegria, a friend of his brother's, whom he thought was moving his belongings to Houston. According to Bratovich, every move that he made on November 16, 1989, was at Alegria's request and on his instructions.


## ANALYSIS

I. The Evidence did not Suffice to Convict Bratovich.

At oral argument, the government argued for the first time that Bratovich failed to object to the sufficiency of the evidence at the trial level. Were this the case, and were the government to properly raise the issue, our review would be "limited to the determination of whether there was a manifest miscarriage of justice. Such a miscarriage would exist only if the record is devoid of evidence pointing to guilt." United States v. Hinojosa,

10

No.91-2260, slip op. 3924, 3928 (5th Cir. April 3, 1992)(quoting United States v. Robles-Pantoja, 887 F.2d 1250, 1254 (5th Cir. 1989)). Bratovich's counsel responded at oral argument by claiming that he implicitly adopted Barreto's motion to acquit for lack of evidence at the close of the government's case. Fed.R.Crim.P. 29, however, requires that the defendant renew his motion at the close of all the evidence in order to preserve the issue for appeal. "Where a defendant fails to renew his motion at the close of all the evidence, after defense evidence has been presented, he waives his objection to the earlier denial of his motion." United States v. Daniel, No. 91-1739, slip op. 3556, 3559 (5th Cir. March 19, 1992)(citing United States v. Robles-Pantoja, 887 F.2d 1250, 1254 (5th Cir. 1989)). In answer to the government's contention at oral argument, Bratovich's counsel responded that he effectively did renew his motion. While we have doubts that this is so, we recognize, as defense counsel stated at oral argument, that various district court judges run their courtrooms in various ways. We do not believe that we can limit our review to a search for manifest injustice when the government raises such an argument, which in fairness to the defendant should have been briefed, for the first time in oral argument. This is especially true in this case because the government, in its brief, described the standard of review as we do immediately below, i.e., as an examination of whether, regarding the facts and inferences to be drawn therefrom in the light most favorable to the verdict, any trier of fact could have reasonably found Bratovich guilty beyond a reasonable doubt.

11

The government did not describe the standard of review as an examination of whether the record is devoid of evidence of guilt. The government cannot, at this late date, alter its proposed standard of review.

The well established standard in this Circuit for reviewing a conviction allegedly based on insufficient evidence is whether a reasonable jury could find that the evidence establishes the guilt of the defendant beyond a reasonable doubt. United States v. Gonzales, 866 F.2d 781, 783 (5th Cir.), cert. denied, 490 U.S. 1093 (1989). The evidence adduced at trial, whether it be direct, circumstantial or both, together with all inferences reasonably drawn from it, is viewed in the light most favorable to the verdict. United States v. Pigrum, 922 F.2d 249, 253 (5th Cir.), cert. denied, 479 U.S. 868 (1991). If the "evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged," this court must reverse the convictions. Clark v. Procunier, 755 F.2d 394, 396 (5th Cir. 1985)(quoting Cosby v. Jones, 682 F.2d 1373, 1383 (11th Cir. 1982)(as quoted in United States v. Fortenberry, 919 F.2d 923, 926 (5th Cir. 1990))). The appellate court does not sit as a de novo jury, and therefore "it is not necessary that the evidence exclude every reasonable hypothesis of innocence," United States v. Stone, No. 91-2193, slip op. 4417, 4421-22 (5th Cir. April 29, 1992); a jury is, after all, "free to choose among reasonable constructions of the evidence." United States v. Bell, 678 F.2d 547, 549 (5th

12

Cir. 1982), aff'd, 462 U.S. 356 (1983). Our task is, rather, to determine whether "a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." United States v. Jackson, 700 F.2d 181, 185 (5th Cir.)(quoting Bell, 678 F.2d at 549), cert. denied, 464 U.S. 842 (1983).

In order for the government to prove conspiracy, the prosecution must prove beyond a reasonable doubt (1) the existence of an agreement between two or more persons to violate the narcotics laws, (2) that each alleged conspirator knew of the conspiracy and intended to join it, and (3) that each alleged conspirator did participate in the conspiracy. Stone, No.91-2193, slip op. at 4421. We conclude that a reasonable jury would have to entertain a reasonable doubt as to Bratovich's guilt.

The government's evidence has shown that:

(1) Bratovich drove the Mustang that approached the white truck occupied by co-defendants Andrade and Menesses near the location where the PENSKE was positioned.

(2) Andrade then approached the passenger side of the Mustang and appeared to speak with Alegria.

(3) Bratovich made two U-turns in an adjacent residential area prior to following the PENSKE driven by Andrade and Menesses.

(4) Bratovich followed the PENSKE for about five miles and turned away when the PENSKE reached a residential area.

(5) Bratovich subsequently drove to his place of business where his brother picked up Alegria.

The government argues that it is (a) reasonable to conclude that the conversation between Andrade and Alegria concerned the PENSKE and its destination and that (b) Bratovich overheard the

13

conversation. This argument misses the point. Even if we accept the government's inferences, it in no way addresses Bratovich's contention that he thought that the PENSKE contained furniture that his brother's friend, Alegria, was moving into his new home. Simply because a conversation may have in fact been about drugs does not mean that a jury can reasonably conclude that one who may have overheard it actually knew that said conversation concerned drugs. Simply because one associates with conspirators does not mean that a jury can reasonably find that he is a member of the conspiracy. <u>Jackson</u>, 700 F.2d at 185.

The government also argues that Bratovich's story is incredible because one who is actually watching his furniture would not veer off once it had reached his neighborhood. We are not sure why this is incredible. Could not Bratovich have believed that someone Alegria trusted was home to receive the furniture? Might not have Alegria been unwilling to continue on to the unloading point with Bratovich for fear that Bratovich would see that the cargo was cocaine? In a similar vein, the government argues that the jury could have believed that it was unreasonable that Bratovich would have believed that Alegria would have left his furniture unattended in a parking lot. There is no evidence, however, that Bratovich knew that the PENSKE had been left unattended for any length of time. Even if we agreed that it did not seem that Alegria was adequately watching over what Bratovich claims to have believed was furniture, it would then be even harder to believe that Alegria was adequately looking after three million

14

dollars worth of cocaine.

Finally, the government argues that the jury's verdict regarding Bratovich was reasonable because the jury could have credited testimony from FBI agents to the effect that the Mustang's behavior was consistent with that of a countersurveillance vehicle. Once again, this misses the point. The Mustang may have been a countersurveillance vehicle, but the question is did Bratovich know what he was surveying?

This trial was the end result of a lengthy sting investigation which never unearthed any evidence of Bratovich's involvement until the very last day of the operation. The record contains no evidence of what Alegria and Andrade discussed in the parking lot. The evidence of Bratovich' guilt is based on inference upon inference. While one may suspect that Bratovich may have been aware of the conspiracy, "[j]uries must not be allowed to convict on mere suspicion and innuendo." Jackson, 700 F.2d at 185.

For similar reasons, we reverse Bratovich's conviction for aiding and abetting. To sustain a conviction of aiding and abetting under 18 U.S.C. § 2, the government must show that the defendant (1) associated with the criminal venture, (2) participated in the venture, and (3) sought by action to make the venture succeed. Nye & Nissen v. United States, 336 U.S. 613 (1949). At most, the government may have proven that Bratovich "participated" in the criminal venture, but "'[a]ssociation' means that the defendant shared in the criminal intent of the principal." United States v. Triplett, 922 F.2d 1174, 1178 (5th Cir.), cert.

15

denied, 111 S.Ct. 2245 (1991). A reasonable trier of fact would have had to conclude that a reasonable doubt existed regarding Bratovich's "association" with the criminal venture, and we will not uphold a conviction for aiding and abetting unless the government has proven all three elements. See United States v. Martiarena, No. 90-8726, slip op. 3158 (5th Cir. March 11, 1992).

II. The District Court did not Err in Denying Barreto's Motion to Suppress her Confession.

Barreto claims that she did not understand her Miranda rights and could therefore not have voluntarily waived them. Moreover, she claims, even if she did understand them, the confession was nevertheless involuntary because she felt that she had to confess to clear her husband. We affirm the district court's denial of the suppression motion.

When reviewing a ruling from a suppression hearing, "[t]his Court must give credence to the credibility choices and findings of fact of the district court unless clearly erroneous." United States v. Raymer, 876 F.2d 383, 386 (5th Cir.), cert. denied, 493 U.S. 870 (1989)(citing United States v. Watson, 591 F.2d 1058, 1061 (5th Cir.), cert. denied, 441 U.S. 965 (1979)). A finding is clearly erroneous only when the reviewing court is left with the "definite and firm conviction that a mistake has been committed." Anderson v. City of Bessemer City, 470 U.S. 564 (1985)(quoting United States v. United States Gypsum Co., 333 U.S. 364 (1948)). The ultimate issue of voluntariness, however, is a legal question

16

requiring the reviewing court to make an independent determination. Raymer, 876 F.2d at 386 (citations omitted).

At the suppression hearing, Special Agent Garcia testified that he explained the Miranda rights to Barreto, stressing her right to have an attorney present and her right not to speak with him. Garcia also testified that it is usually the case that Hispanic foreigners will refuse to sign a waiver even if they wish to waive their rights. Garcia stated that he even left the room so that Barreto could contemplate whether or not she wished to waive the rights that Garcia had concluded she understood. Garcia testified further that he never promised Barreto that her cooperation would lead to the exoneration of her husband.

Barreto testified at the suppression hearing that Garcia did not frighten her or raise his voice, but that she could not remember whether or not he explained her rights to her. She said that she understood that her cooperation would help her husband, but did not specifically testify that Garcia told her this.

The district court's crediting of Garcia's testimony that Barreto understood her rights is not clearly erroneous. Moreover, Barreto's own testimony does not necessarily imply that she was acting under what she considered to be a promise that her husband would go free if she cooperated. A reasonable reading of her testimony is that she believed that by taking all the blame herself, her husband would necessarily be helped. While a confession made induced by an assurance that there will be no prosecution is not voluntary, United States v. Rogers, 906 F.2d

17

189, 192 (5th Cir. 1990), the district court justifiably found no such promise here.

## III. The District Court did not Err in Increasing Barreto's Base Offense Level.

Barreto claims that the district court erred in increasing her base offense level by two points according to Guidelines § 2D1.1(b)(1) which mandates a two point increase if the sentencing court finds, by a preponderance of the evidence, United States v. Casto, 889 F.2d 562, 570 (5th Cir. 1989), cert. denied, 110 S.Ct. 1164 (1990), that the defendant possessed firearms during the commission of the offense. We review the district court's factual findings for clear error. United States v. Rivera, 898 F.2d 442, 445 (5th Cir. 1990).

FBI agent Michael Sutton, who was involved in the arrest of the Barretos and the search of their home, testified that he found a pile of money behind a nightstand in the master bedroom. In the drawer of the nightstand were several loaded automatic pistols. In the closet of the bedroom was a coat, the pocket of which contained cocaine. Also in the closet was a gun in the proximity of loaded magazines.

Barreto argues that the guns belonged not to her, but to her husband. This misses the point. What matters is not ownership, but access. United States v. Villarreal, 920 F.2d 1218, 1221 (5th Cir. 1991). Moreover, it matters not that Barreto may not have intended to use these automatic weapons in the offense, it suffices

18

that they could have been so used. <u>Id.</u> Nor, due to amendments in the Guidelines, is it even necessary for the district court to make a finding of scienter if the arrest occurred subsequent to November 1, 1989. <u>United States v. Suarez</u>, 911 F.2d 1016, 1020 (5th Cir. 1990).

According to Application Note 3 of the Commentary to Section 2D1.1:

> The enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons. The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense. For example, the enhancement would not be applied if the defendant, arrested at his residence, had an unloaded hunting rifle in the closet.

The weapons in this case seem to be of the type envisioned by the Sentencing Commission as triggering the enhancement. These were not unloaded hunting rifles found only in the closet. These were loaded automatic pistols by the bed. If a "dinky little gun" which was probably not intended for use in the drug offense sufficed to trigger the enhancement in <u>United States v. Hewin</u>, 877 F.2d 3, 5 (5th Cir. 1989), these weapons will certainly do the trick.

IV. <u>The District Court did not Err in Refusing to Instruct the Jury as to Menesses' Proposed Entrapment Defense.</u>

Menesses proposed that the district court instruct the jury as to a proposed defense of entrapment. As we have stated:

> Entrapment is an affirmative defense designed to ensure that persons not be held criminally liable for acts which they were induced to commit, without prior predisposition

19

to engage in such activity, by law enforcement officials. In order to be entitled to rely on a defense of entrapment, a defendant must present some evidence that Government conduct created a substantial risk that an offense would be committed by a person other than one ready to commit it. Once this prima facie showing of entrapment has been made, the burden falls on the Government to prove beyond a reasonable doubt that the defendant was predisposed to commit the crime, and therefore, was not entrapped.

United States v. Johnson, 872 F.2d 612, 620 (5th Cir. 1989)(citations omitted).

Moreover,

[w]hen a court determines that no reasonable jury could find, beyond a reasonable doubt, that the defendant was predisposed to commit the crime, then the court may determine that entrapment has been established as a matter of law. Where there is some evidence to support a finding of predisposition, the issue is properly presented to the jury.

Id. at 621.

However, "the mere assertion of entrapment does not require the trial judge to automatically instruct the jury on it." United States v. Andrew, 666 F.2d 915, 922 (5th Cir. 1982). If the defendant fails to demonstrate the existence of even a scintilla of evidence that government agents entrapped him into committing a crime that he was not otherwise predisposed to commit, then he has failed to make the required prima facie showing and is therefore not entitled to such a jury instruction. Id. at 923-24.

The evidence in this case in no way suggests entrapment. The record reveals that Menesses told Special Agent Garcia that he became involved in the offense as early as June, 1989. He admitted that he was responsible for securing rooms for his Miami associates and a storage site for the contraband. The first contact Menesses

20

had with government agents did not occur until he and Andrade received the keys to the PENSKE at the Two Pesos Restaurant.

The government did no more than to advertise a service, to wit, the ability to transport large quantities of drugs. As the Supreme Court has said, "[t]o determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal." Sherman v. United States, 356 U.S. 369, 372 (1958). There is no evidence suggesting anything but that Menesses was an unwary criminal. Therefore, the district court did not err in refusing to give an instruction on entrapment to the jury.


CONCLUSIONS

The record indicates that Danny Barreto understood her rights and did not confess under the illusion that Special Agent Garcia had promised that her husband would go free. Therefore, the district court did not err in refusing to suppress her confession. Nor did the district court err in enhancing her sentence by two points, as was required by the Guidelines due to the presence of nonsporting weapons in the vicinity of her bed and bedstand in which drug deal money was stashed. Finally, the district court did not err in refusing to instruct the jury on entrapment because Menesses has failed to point out evidence suggesting that he had been entrapped. The district court did err, however, in sending the counts relating to Bratovich to the jury. We reverse the conviction as to Bratovich and remand to the district court for

21

proceedings in accordance with our opinion.

This judgment of the district court is AFFIRMED in part, REVERSED and REMANDED in part.