**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Marlin Walter LARSON, D.O.,
Defendant-Appellant.**

No. 82–1586.

United States Court of Appeals,
Fifth Circuit.

Dec. 23, 1983.

Certiorari Denied March 26, 1984.
See 104 S.Ct. 1688.

Kenneth King, Dallas, Tex., for defendant-appellant.

John Mitchell Nevins, Asst. U.S. Atty., Dallas, Tex., for plaintiff-appellee.

Before BROWN and RANDALL, Circuit Judges, and HUNTER *, District Judge.

JOHN R. BROWN, Circuit Judge:

Dr. Marlin Walter Larson, a Dallas osteopath who has practiced medicine for more than 20 years, was indicted in July, 1982, on four counts of prescribing controlled substances without a legitimate medical purpose in violation of 21 U.S.C. § 841(a)(1). Larson went to trial in September, 1982, was convicted by a jury on all four counts, and received a total sentence of eight years imprisonment with a five year special parole term. On appeal, Larson contends that the trial court erred in failing to instruct the jury on entrapment, and that the jury was erroneously provided with a transcript of a taped conversation. We find Larson's contentions to be without merit and affirm.

### · Facts: A Weighty Problem

In March of 1973, Marshall "Mike" Richards began a series of visits to Dr. Larson that was to span almost ten years. At the time Richards began seeing him, Larson was in practice with another doctor and the two doctors treated a substantial number of overweight persons. The treatment prescribed for these individuals consisted of a limited diet, counseling, and, if hypertension was not a problem, a prescription for an amphetamine-like appetite suppressant. Richards was a weight patient who received prescriptions for Preludin,[1] one of these "diet pills," each month for many years.[2]

---

* District Judge of the Western District of Louisiana, sitting by designation.

[1.] Preludin is the trade name for phenmetrazine hydrochloride, a schedule II controlled substance. Richards received 75-milligram Preludin Endurets, the highest dosage available. The government introduced evidence from the Physician's Desk Reference (PDR) which states that Preludin has a high potential for abuse, and that tolerance to the drug usually develops within a few weeks. When this occurs, "the drug should be discontinued."

[2.] Richards was in the military service for approximately eighteen months and did not see Dr. Larson during that period of time. Dr. Larson also apparently failed to prescribe drugs for Richards on several occasions when Richards' blood pressure was elevated. Nevertheless, the evidence showed that Richards was given a prescription for a one month supply of Preludin 38 times between February, 1979 and May, 1982. For over three years, then, Richards received a prescription on the average of once a month.

There was conflicting evidence at the trial raising significant doubt as to the suitability of long term use of Preludin. A government expert testified, for example, that Preludin should not be prescribed for longer than two to four weeks at a time. Moreover, there was evidence that Richards gained rather than lost weight. Finally, Richards himself claimed that he had injected the drugs instead of taking them orally, and that Dr. Larson was aware of this practice. Over the ten year period, Richards testified he was seeing between 15 and 20 other diet doctors in the Dallas area, receiving prescriptions from most of them. He sold some of the drugs and personally used the rest.

In early 1982, Richards was arrested for driving under the influence of drugs, possession of drugs, and driving with a suspended license, all misdemeanors. In early or mid-April, he contacted the Dallas Police Department and offered to assist the police in obtaining evidence regarding the allegedly illegal activities of Dr. Larson and some of the other doctors he was seeing. In exchange, the police agreed to drop the misdemeanor charges, assist Richards financially in moving to another city, and help him find suitable employment there.[3]

### Uppers for the Patient . . .

Richards told the police that in November of 1981, he and Dr. Larson began exchanging camera equipment for prescriptions. In November, Richards claimed he brought in his girl friend, Susan Teagarden, who told Dr. Larson she suffered from insomnia. Richards and Teagarden offered the doctor a Vivitar flash unit worth about $100 in exchange for a prescription for Quaalude.[4] Dr. Larson testified, on the other hand, that the exchange for camera equipment did not begin until March, 1982.

Richards testified, and the evidence confirmed, that on March 23, Dr. Larson prescribed a one-month supply of both Preludin and Valium in the name of James L. Stewart. While Richards claimed he had made up this name at Larson's request, Dr. Larson testified that Richards actually brought in a friend who wanted to lose weight. Since Dr. Larson did not want to take on any more weight patients, he stated that he agreed to see Stewart as a favor to Richards and prescribe medication on a one time

only basis. Larson maintained no file on a patient by that name. Similarly, on March 26, 1982, Larson claimed that Richards brought in two friends who were introduced as Carolyn and Franklin Barnes. They, too, wanted to lose weight and Larson again agreed to prescribe medication for them one time only. He prescribed Desoxyn[5] and Valium for Carolyn and Preludin and Valium for Franklin, again maintaining no medical file on either. Richards again stated that he had merely made up the names— no actual patient had visited Dr. Larson, who received camera equipment in exchange for issuing the prescriptions.

According to Larson, the camera exchange began on March 30, 1982. Larson testified that Richards brought in four friends who were in the camera business. These friends were allegedly unable to induce their own doctors to prescribe any more diet medication for them, and offered to obtain camera equipment for Dr. Larson if he would see them and prescribe diet medication for them under assumed names. Dr. Larson claims he examined the people, finding them to be overweight and within acceptable blood pressure limits. He prescribed Desoxyn under the names of James and Cheryl Henderson and Preludin under the names of Mary and Sammy Fisher.[6] Richards claimed that he did not bring any friends in on that date, but had visited the doctor himself and supplied the names for the prescriptions.

This scenario was repeated on several other occasions. On May 5, Larson prescribed Valium and Desoxyn for Sammy

---

3. Before the trial, however, Richards was arrested on a felony charge of aggravated robbery and the Dallas Police Department could no longer "help" him. At the time of trial, he was in police custody.

4. Quaalude is a trade name for Methaqualone, a schedule II controlled substance. The PDR states that the drug is a hypnotic sleep-inducing agent which may lead to "severe psychological dependence."

5. Desoxyn is a trade name for methamphetamine hydrochloride, also a schedule II controlled substance. The PDR contains a warn-

ing that the drug has a "high potential for abuse," and "should thus be tried only in weight reduction programs for patients in whom alternative therapy has been ineffective." Prolonged use "must be avoided," and doctors should pay "particular attention" to the possibility that subjects might obtain the drug for "nontherapeutic use or distribution to others."

6. The true name of Richards' cousin and the cousin's ex-wife are Mary and Sammy Fisher. Dr. Larson admits, however, that he knew the people he prescribed for were not Mary and Sammy Fisher.

and Mary Fisher. On May 12, he prescribed the same drugs in the names of James and Cheryl Henderson.

On April 12, Dr. Larson prescribed Valium and Desoxyn in the name of Billy Marable, another friend Richards allegedly brought to the office. The government produced a death certificate indicating that Marable had died in 1974. Larson prescribed Desoxyn and Valium again in Marable's name on May 12. On April 26, Larson prescribed Preludin for Larry and Susan White, and again claimed they were friends of Richards. Larry White is a friend of Richards, but he never visited Dr. Larson. Richards claims that during this period, the only friend he brought in to Dr. Larson's office was William Denham, for whom Larson prescribed Valium and Quaalude on May 17. Larson claims he was unaware that Richards had filled each of these prescriptions himself.

On April 30, Richards was driven to Dr. Larson's office by Dallas police investigators Fred Sexauer and Bob Jennings. The officers placed a microphone and transmitting device on Richards' person and monitored his conversation with Larson from their vehicle. The tapes revealed that Richards delivered a camera lens and filled out office visit forms in the names of Sheila and Robert Simmons. After discussing whether or not the lens might be exchanged for another brand, Larson wrote a prescription for Preludin in the name of Robert Simmons, and for Desoxyn in the name of Sheila Simmons. Larson testified that prior to this meeting he had spoken by telephone to the "camera people" for whom he had previously written prescriptions under the assumed names of James and Cheryl Henderson. Larson explained that the "Hendersons" wanted refills on their prescriptions which Richards was to pick up. Larson's story, in addition to being implausible, is inconsistent because he had originally prescribed Desoxyn for both Hendersons, but on this occasion prescribed Desox-

yn for Sheila Simmons (who he thought was "Cheryl Henderson") and Preludin for Robert Simmons (who he thought was "James Henderson"). The act of writing these prescriptions, which was taped and transcribed, formed the basis for counts 1 and 2 of the indictment.

On May 24, 1982, the officers again drove Richards to Larson's office, where he went in alone, again wearing a microphone. The tape and transcript of this visit revealed that Dr. Larson gave Richards a prescription for Desoxyn in Richards' own name, and a prescription for Quaalude in the name of Susan Jarvis. No medical examination took place. These prescriptions were to be exchanged for a camera lens,[7] and formed the basis for counts 3 and 4 of the indictment.

On June 28, 1982, Officer Sexauer and DEA investigator Jerry Ellis visited Dr. Larson in his office wearing microphones. When questioned about whether he had traded prescriptions written under false names for camera equipment, Larson denied that he had done so. He further stated that he had never written controlled prescriptions for Richards using other peoples' names. Finally, Larson maintained that he had no knowledge of how Richards had obtained and filled prescriptions in the names of Mary and Sammy Fisher, Susan Jarvis, Robert and Sheila Simmons, and Billy Marable. He was unable to produce records on any of these "patients" except Richards, thus showing a failure to comply with customary medical practice.

### A Downer for the Doctor

Presented with this evidence, the jury returned a guilty verdict on all four counts thirty-seven minutes after retiring. Larson's appeal is based on the trial court's failure to instruct the jury on entrapment and the jury's use of the tape transcripts.

### Entrapment

Larson contends that the foregoing facts warranted a jury instruction on the defense

---

7. "I'll give him two and I'll get the lens, okay?" said Dr. Larson in the course of the conversation. This statement corroborates Richards' claim that Larson thought there was only one other person involved in the camera exchange.

of entrapment. However, his attorney neither requested such an instruction nor did his defense theory emphasize facts which would bring a possible entrapment defense to the Court's attention. Our duty is therefore independently to view the record "as a whole," *Pierce v. United States,* 414 F.2d 163, 168 (5th Cir.1969), to determine whether the trial court's failure to give an entrapment instruction constituted plain error affecting Larson's substantial rights. *United States v. Benavidez,* 558 F.2d 308, 309 (5th Cir.1977); *United States v. Young,* 655 F.2d 624 (5th Cir.1981) (failure to instruct *sua sponte* on lesser included offense not plain error when there is substantial evidence that greater offense was committed).

■ Under the plain error standard, we afford relief only if the alleged error is " 'so obvious that failure to notice it' " seriously affects the " ' "fairness, integrity or public reputation of judicial proceedings," ' " resulting in a " 'miscarriage of justice.' " *United States v. Lyons,* 703 F.2d 815, 821 (5th Cir.1983) (citations omitted).

■ In *United States v. Benavidez, supra,* we held that in "determining whether a general entrapment charge should have been given, we must accept the testimony most favorable to the defendant." *Id.* at 309. Nonetheless, the defendant bears the burden of fairly raising the issue of entrapment, the key to which is evidence indicating his lack of predisposition to commit the crime in question absent government interference. *Id.* at 310; *United States v. Andrew,* 666 F.2d 915, 922 (5th Cir.1982). Lar-

son argues that his lack of predisposition is clearly demonstrated by the alleged fact that he had never done anything illegal before Richards, the government informer, induced him to write prescriptions in fictitious names.

This contention is clearly without merit. Although it is true that the prescriptions which served as the basis for the indictment were issued *after* Richards became a government informer, the evidence demonstrated that Larson had previously written prescriptions in fictitious names on March 23, March 26 and March 30 [8]—before mid-April, when Officer Sexauer testified that Richards had approached the police. Indeed, Larson does not dispute the fact that the March 30 prescriptions were issued in exchange for camera equipment.

*United States v. Greenfield,* 554 F.2d 179 (5th Cir.1977), which Larson points out is factually similar in that the physician there prescribed amphetamines in a fictitious name, is nonetheless distinguishable because in that case all the prescriptions were issued to an individual who was an informer from the inception of the doctor-patient relationship. Moreover, *Greenfield,* though factually similar, is legally distinguishable because there an entrapment instruction was requested and refused. We held in *Greenfield* that a defense of entrapment is not inconsistent with a claim of innocence under the "peculiar circumstances" of an alleged violation of 21 U.S.C. § 841(a)(1). *Greenfield, supra,* at 181–82.[9]

---

**8.** Although evidence of the earlier prescriptions was most likely admitted at trial to show Larson's unlawful intent and scheme in writing the prescriptions for which he was indicted, this evidence would have been equally admissible under Fed.R.Evid. 404(b) to establish predisposition for purposes of rebutting any claim of entrapment. *See United States v. Robinson,* 446 F.2d 562 (5th Cir.1971), *cert. denied* 404 U.S. 959, 92 S.Ct. 323, 30 L.Ed.2d 277.

**9.** The thrust of *Greenfield* was merely to create an exception to the well-established rule that "one may not claim he was entrapped into a criminal act without first admitting that he did in fact commit it." *United States v. Rey,* 706

F.2d 145, 147 (5th Cir.1983); *United States v. Nicoll,* 664 F.2d 1308 (5th Cir.1982).

The reversal in *Greenfield* was based on the trial court's refusal to instruct the jury on entrapment due to its belief that the general rule was applicable. The Court of Appeals found, however, that it was not "impermissibly inconsistent" for the defendant to argue first that he did not knowingly dispense drugs without a legitimate purpose (i.e., he thought the prescriptions were legitimate but admits the physical act of prescribing) and, second, that to the extent that he *may* have prescribed without a legitimate medical purpose, he was not predisposed to do so (i.e., he was entrapped). *Greenfield, supra* at 183.

The rule emerging from *Greenfield,* however, has little applicability to this case. In *Greenfield,* the defendant tried the case with a view toward raising an entrapment defense, which is evidenced by the fact that he requested four separate jury instructions on entrapment. We did not go so far there as to hold that the evidence *entitled* him to such charges; instead, we reversed and remanded for a new trial, advising reconsideration of the charge in light of the evidence which would be adduced at the new trial. *Id.* at 181.

█ In the instant case, to the contrary, Larson's sole defense was that although he had issued prescriptions under assumed names, he honestly thought that the prescriptions were going to real people whom he had previously examined. Indeed, he admitted that he knew that what he was doing was wrong. The tapes revealed that Larson directed Richards to fill out office visit forms and supply names for the false prescriptions. He told Richards not to bring friends around the office and refused to see Richards when his nurse's son was present. These facts, among others, clearly demonstrate Larson's knowledge of the illegal nature of his acts.

Larson therefore did not produce enough evidence for us to conclude that any error by the trial court in failing to raise the entrapment defense *sua sponte* was so "substantial" or "obvious" as to constitute plain error.[10] *United States v. Gerald,* 624 F.2d 1291, 1300 (5th Cir.1980).

10. Indeed, we point out that Rule 30 of the Federal Rules of Criminal Procedure specifically provides that the failure to object to "any portion of the charge or omission therefrom" before the jury retires precludes any later assignment of error in the charge. We have held in another context that the "plain error rule must not be used to eliminate Rule 30." *United States v. Gerald,* 624 F.2d 1291, 1300 (5th Cir. 1980). There, we held that an isolated error in the jury charge would not amount to plain error when the charge, "viewed as a whole . . . is correct."

11. Before the transcripts were passed out, the judge instructed the jury as follows:

### Use of Transcripts

Larson first claims that the trial court erroneously allowed the jurors to read written transcripts of the taped conversations as the tapes were played in court. Although the tapes themselves were received in evidence, the transcripts were not. Larson properly points out that the "need or desire for transcripts arises generally" in two situations: first, the tapes may be "relatively inaudible," and second, it might otherwise "be difficult to identify the speakers." *United States v. Onori,* 535 F.2d 938, 947 (5th Cir.1976). He claims that neither of these situations was present; therefore, the jury should not have had access to the transcripts. We disagree.

█ Whether the use of transcripts is warranted is a matter resting with the sound discretion of the trial judge. *United States v. Ruppel,* 666 F.2d 261, 272 (5th Cir.1982). The judge specifically stated that the transcripts were only provided to assist the jury in understanding what was on the tapes. We find no abuse of discretion here. In so doing, we emphasize that the limiting instructions provided by the trial judge comported precisely with our admonishment in *Onori, supra,* at 949, that "the key to protecting a defendant's rights [when a transcript is used] lies in seeking limiting instructions." [11]

Furthermore, our reading of the trial proceedings discloses that counsel for appellant raised no objection to the jury's use of the transcripts after the court issued its limiting instruction. In fact, defense counsel

Now, let me give you some instructions about this transcript. Whoever prepared it may have made a mistake, they may not have put down on paper what was actually on the tape. In other words, the tape is the evidence. The transcript is not evidence. It's just a summary of what's on that tape; thus, if you hear the tape and the transcript doesn't correctly reflect what's on the tape, disregard the transcript. The tape is the evidence. So if there's any conflict between the tape and the transcript, the tape is what you go by, not the transcript. The transcript is merely to assist you in following the tape along. They're helpful, but it's just an aid and it's not the real evidence.

stated, "I ... have no objection to the Jury referring to the transcripts as they listen to the tape. I would object to them being introduced in evidence because I believe the tape is the evidence." No objection was made before the jury retired; thus, we may only review the matter if we find it constitutes "plain error" under F.R.Crim.P. 52(b). We find no error of this magnitude for the same reasons we earlier found no abuse of discretion.

■ A timely objection was raised, however, to the jurors' use of the May 24 transcript after they had retired. Larson therefore preserved for appeal his contention that only formally admitted "evidence" may be used during jury deliberations. As a threshold matter, we reiterate our holding in *Onori* that transcripts are admissible *as evidence* subject to the court's issuance of proper limiting instructions.[12] *Onori, supra* at 947. In view of the court's charge to the jury and the fact that the jurors had already read the transcript during trial, we decline to find that the failure to formally introduce what the trial judge referred to as "quasi-admitted" evidence was anything other than harmless error. We find no prejudice arising from the jury's brief second look at the transcript.

■ We similarly find no merit in Larson's contention that submission of the transcript was improper because it omitted the final portion of the May 24 taped conversation. In this portion of the tape, Richards complains to the investigators that Larson had "paid" for a camera lens with a prescription in Richards' own name, thus precluding Richards from receiving another prescription during that month for his own use. Defense counsel called attention to

this omission during the trial, and the judge specifically advised the jurors that there would be an omission from the transcript which they would hear on the tape. The omission was fully explored during examination of Richards, and defense counsel stated during closing argument that the omitted conversation indicated Larson's wish to stop prescribing in fictitious names. We therefore do not find the omission prejudicial and again find any error to be harmless.

In finding no merit to Larson's last two assertions of error, we are in accord with the Eleventh Circuit in *United States v. Costa,* 691 F.2d 1358 (11th Cir.1982). That Court specifically refused to find error in the similar use of transcripts during jury deliberations "absent anything more than a presumption" that the transcripts were the reason for the guilty verdict and "a generalized claim that the jury must have been prejudiced." *Id.* at 1363.

### Conclusion

For the foregoing reasons, we find the jury instructions and evidentiary rulings of the district judge to be correct.

AFFIRMED.

12. The District Court gave the following instruction immediately prior to the time the jury retired:

Now, at this time I'm not going to deliver the tapes to you nor the transcripts. However, if you desire the transcripts, if you'll notify the Marshal in writing of your desires, we'll bring the recording equipment in and produce those for you and I'll have some official show you how to operate the equipment. But I'm not preventing you from having this evidence available to you and if you need it, do not hesitate to ask for it in any respect. If you do get the transcripts; remember again my instructions about those transcripts; they're not the evidence in the case. The evidence is on the tapes. Thus if the transcripts vary to any extent from what you hear on the tapes, you're to disregard those transcripts and the tape is the evidence by which you will base any verdict in this case, if you arrive at one.