IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 91-2373

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MIKE TAGLE RENA and
MIKE RENA, JR.,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Texas

_____

( January 12, 1993)

Before KING, JOHNSON and DUHÉ, Circuit Judges.

JOHNSON, Circuit Judge:

During the trial of defendants Mike Tagle Rena (Rena, Sr.) and his son Mike Rena, Jr. (Rena, Jr.), the jurors were allowed to review transcripts of recorded telephone conversations which included the impressions of transcribers. Both defendants argue that the district court committed reversible error in allowing the jurors to see that extraneous material. Rena, Jr. further claims that there was insufficient evidence to convict him and in the alternative, the conspiracies alleged in two counts of the

indictment were actually one ongoing conspiracy.

I.  Facts and Procedural History

Rena, Sr. and Rena, Jr. were indicted with twelve other individuals for their involvement in the distribution of marijuana. The Narcotics Service of the Texas Department of Public Safety (DPS) obtained authorization to place a wire tap on the home telephone lines of Rena, Sr. and Rena, Jr. and on the line of Rena and Sons Paint and Body Shop, an automotive shop owned by Rena, Sr. The intercepts began on February 19, 1990 and ended on March 17, 1990. Based upon those intercepts and other information, Rena, Sr. was charged with one count of engaging in a continuing criminal enterprise, three counts of conspiracy to possess with intent to distribute marijuana, and three counts of possession with the intent to distribute marijuana. Rena, Jr. was charged with three counts of conspiracy to possess with intent to distribute marijuana and two counts of possession with intent to distribute marijuana.

During the trial, the court allowed the parties to play the tapes for the jury. The court also allowed the jury to review transcripts written by DPS personnel, because a substantial number of the conversations on the tapes were in Spanish.[1] An official court interpreter had reviewed each of the tapes and transcripts and had either determined that the transcripts were acceptable or had corrected any mistakes thereon. The transcripts also contained

---

[1] All but one of the jurors understood both English and Spanish. The court therefore informed the jurors that they were to determine for themselves the contents of the tapes--that the transcription was not the evidence, but only the tapes.

synopses of the conversations. These synopses, which were always on the first page, were written by the transcriber. Some of the synopses and the transcripts contained parenthetical interpretations by the transcriber.[2] The court informed the jurors before the first tape was played and before they received the first transcript that the tapes, not the transcripts, were evidence.[3] The court so instructed the jurors at least twelve times throughout the four day period during which the Government offered the tapes into evidence.

The jury found Rena, Sr. guilty of each of the seven counts and the court sentenced him to imprisonment for two hundred ninety-three months and a five year term of supervised release. The court dismissed the possession charges against Rena, Jr. based upon the lack of evidence of such possession; however, the jury found him guilty of the conspiracy counts. The court sentenced Rena, Jr. to incarceration for life and a five year term of supervised release due, in part, to his four previous convictions.

Both Renas claim that allowing the jurors to review the transcripts was reversible error; they therefore ask the Court to reverse and remand for a new trial. Rena, Jr. further claims that there was insufficient evidence to convict him of any conspiracy.

---

[2] For example, the transcriber interpreted "parts" as being marijuana, "car titles" and "papers" as money, "two for forty-eight" as two kilos for forty-eight thousand dollars, and "it" as the load.

[3] He instructed the jury prior to its receipt of the transcripts that "[w]hat's in the transcript, although it is in English, is not the evidence. It is just a translation of the tape. The tape is the evidence."

3

In the alternative, he argues that two of the conspiracies charged were only one conspiracy.

## II.  Discussion

A.  Transcripts

Whether the jury should have the use of transcripts is a matter left to the sound discretion of the trial judge. *United States v. Larson,* 722 F.2d 139, 144 (5th Cir. 1983), *cert. denied*, 466 U.S. 907 (1984); *United States v. Onori*, 535 F.2d 938, 947 (5th Cir. 1976). Thus, in the usual case, the Court will not reverse absent an abuse of discretion.  However, this is not the usual case, for the Renas failed to preserve any error with respect to the extraneous comments added in the transcripts.[4]  The Court

---

[4]  On the two separate occasions which Rena, Sr.'s attorney complained of the transcripts, the court responded that the transcripts were not evidence, that the court would so instruct the jurors, and that the attorneys would be allowed to point out any variances to the jury.  Each time, the attorney acquiesced. Prior to the admission or playing of the tapes the court responded to Rena, Sr.'s objection:

> THE COURT:  I will tell you how we will deal with this real simply, all right. . . .
> I will allow you -- and [the jurors] will be told, for example, as would regard the transcript, that it is not the evidence.  But I will permit you to show them where there is a variance, if any, and they will be reminded that the evidence is the tape, itself.

> MR. R. MARTINEZ:    Very few.

> THE COURT:  I will permit you to clarify that. In the interest of time, i [sic] have always found, for example, in order for the interpreter not to have to go through the tape, itself, I permit the jury to look at the transcript as translated, if you have no objection, and then you can clarify from there.

> MR. R. MARTINEZ:  All right, sir.  That's fine, sir.

4

must therefore apply the plain error standard of review. FED. R. CRIM. P. 52(b); *United States v. Navejar*, 963 F.2d 732 (5th Cir. 1992). Plain error occurs when the error is "so obvious and substantial that failure to notice and correct it would affect the fairness, integrity, or public reputation of judicial proceedings." *Id*. (quoting *United States v. Lopez*, 923 F.2d 47, 50 (5th Cir.), *cert. denied*, 111 S.Ct. 2032 (1991)).

In *United States v. Onori*, the Court determined that transcripts are sometimes useful for helping juries to understand evidence of taped conversations. 535 F.2d at 947. The Court concluded that when parties do not agree upon the accuracy of a transcript, the trial court may explain to the jury that a dispute exists about the proper translation and should allow each party to present evidence of its proffered version. *Id*. at 948-49. Upon a

---

Moreover, during the presentation of Rena, Sr.'s case, Mr. Martinez, himself, offered into evidence a taped conversation and presented the jurors with a Government transcript which contained a prejudicial parenthetical impression which interpreted the word "machine" as narcotics. He did this even though he had prepared another transcript of the same conversation which did not contain the extraneous remark.

In *United States v. Larson*, although the defense counsel objected to the use of transcripts prior to the district court's issuance of a limiting instruction, it did not object after the instruction. 722 F.2d at 144-45. The Court therefore determined that it was limited in reviewing for plain error. In this case, the defense counsel objected prior to the limiting instructions, but by acquiescing to the Court's decision on how to handle the transcripts and by offering one of the transcripts into evidence himself, he, in essence, withdrew his objection and therefore failed to preserve any error. *See* JACK B. WEINSTEIN AND MARGARET A. BERGER, WEINSTEIN'S EVIDENCE § 103[04] (1991) ("An objection apparently withdrawn by counsel will not preserve an error since the trial court would have no reason to correct its ruling if it felt that counsel had acquiesced.").

5

party's request, the court should also provide limiting instructions to inform the jury that the transcript is "just another piece of evidence subject to objections, that it may have to be evaluated for accuracy, and that the jury need not accept any proffered transcript as accurate." *Id*. at 949. The Court found that the instructions provided in *United States v. Larson* "comported precisely with our admonishment in *Onori*."[5] 722 F.2d at 144. Certainly, the court's instructions to the jury in this case were just as sufficient.[6] However, unlike the transcripts in

---

[5] There, the trial court instructed the jurors in the following manner:

> Now, let me give you some instructions about this transcript. Whoever prepared it may have made a mistake, they may not have put down on paper what was actually on the tape. In other words, the tape is the evidence. The transcript is not evidence. It's just a summary of what's on that tape; thus, if you hear the tape and the transcript doesn't correctly reflect what's on the tape, disregard the transcript. The tape is the evidence. So, if there's any conflict between the tape and the transcript, the tape is what you go by, not the transcript. The transcript is merely to assist you in following the tape along. They're helpful, but it's just an aid and it's not the real evidence.

722 F.2d at 144 n.11.

[6] The Court instructed the jury as follows:

> All this translates to this, okay, that, you see, when the tapes are allowed in evidence, that is the evidence, the tape. Now, sometimes, and in this instance apparently there were some transcripts made of what is contained in the tape, the transcript is there to help you. It is not the evidence. The evidence is the tape.
>
> Now, another thing that I want to call to your attention is the fact that this transcript is going to be in the English language because everything that is done in court has to be translated to the English

6

*Larson* and *Onori*, the transcripts in this case not only contained alleged variances from the tape, but they also contained the transcribers' interpretations of some of the words used in the conversations. Also sixty of the eighty transcripts contained short, one-paragraph synopses of the recorded conversations.[7]

Some of the interpretations had the potential of being extremely prejudicial,[8] and they all could have easily been removed prior to the jury's review thereof.[9] Thus, the court clearly

language. All right. Now, as you noticed in the course of -- everything is translated by a Certified Interpreter. You notice that one of the attorneys made an objection as to what is contained in the transcript. What's in the transcript, although it is in English, is not the evidence. It is just a translation of the tape. The tape is the evidence.

I am going to permit counsel to show exactly what variances there are, if any, that he contends exists in the tape.

[7] Including those sixty pages of synopses, the transcripts comprised more than 250 pages. Approximately fifteen of the synopses contained prejudicial interpretations, and the transcribers included approximately six one-word interpretations in the 190 pages of actual transcript. Not all of those interpretations were prejudicial. For example, the transcriber determined that the word "slab" was a code word for "boat."

[8] The transcribers interpreted certain words, such as "parts," "it," "small amount," "cement," and "machine," as marijuana or narcotics. They also interpreted the words "car titles" and "papers" as money. The transcribers explained in the synopses that "a 7" actually meant 70 or 700 pounds and that "two for forty-eight" was code for two kilograms for $48,000.

[9] Because the first page of the first sixty transcripts only contained synopses, the court could have ordered them removed. Removal would not have disturbed the translation of the conversation, for the true transcripts all began on the second page. The court or the Government seemingly realized this, for the synopses of the last twenty transcripts were apparently removed. Further, the Government could have marked out the six parenthetical interpretations in the text of the transcripts so

abused his discretion in allowing the Government to provide such extraneous material. However, Government witnesses provided basically the same information while testifying. Thus, the error, though obvious, was not substantial. It therefore failed to result in the manifest injustice which compels reversal under the plain error standard of review.

More importantly, the jurors themselves could have broken the code for the majority of terms which were improperly interpreted based upon other evidence which the Government presented. For example, with respect to the word "part," Rena, Sr. telephoned an individual, Pop, in Maryland on the morning of March 3, 1990 to inform him that his nephew, Joe, was driving to that location and that he would have 125 or 126. After informing Pop of the price for these items, Pop complained that they were too expensive. Fewer than five minutes after calling Pop, Rena, Sr. talked with another person and informed him that Pop was "crying because of the prices of the car parts." DPS Troopers testified that on the afternoon of March 3, they stopped Rena, Sr.'s nephew, Joe Rena, driving north of Houston, with 126 pounds of marijuana. Based upon this undisputed evidence, a reasonable juror could have easily determined that a code word for marijuana was "parts."[10]

_____

that the jury could not read them.

[10] Many of the other code words could have just as easily been broken by the jurors without the extraneous interpretations. The Government seems to have had a strong case against the Renas with respect to two of the conspiracy charges, yet it risked the convictions of these defendants by including such prejudicial, yet unnecessary, material even though it could have elicited persuasive testimony from credible witnesses with respect to each

8

Because Government witnesses explained their interpretations of key words during the trial and because we believe that the jurors could have determined the meaning of a number of the key words even without the aid of Government witnesses, we conclude that submitting the extraneous comments with the transcripts, though erroneous, did not affect the substantial rights of either Rena and was therefore harmless error. *See* FED. R. CRIM. P. 52(a).

B.   One or Two Conspiracies?

Rena, Jr. argues that the conspiracies alleged in Counts 15 and 17 were, in fact, one conspiracy.  If there is only one agreement to carry out the overall objective, even though various parties are engaged in different functions, there is only one conspiracy.  *United States v. Lokey*, 945 F.2d 825, 831 (5th Cir. 1991).  However, if there is no overall goal or purpose more than one conspiracy may exist.  *United States v. Perez*, 489 F.2d 51, 62 (5th Cir. 1973); *cert. denied*, 417 U.S. 945 (1974).  This Court has set out five factors which aid in determining whether there is more than one agreement:  1)  The time period alleged,  2)  The co-conspirators involved,  3)  The statutory offenses charged,  4) the overt acts or description of the offense charged which indicates the nature and scope of the activity which the Government alleged was illegal,  and 5)  the location of the events which allegedly took place.  *United States v. Nichols*, 741 F.2d 767, 771 (5th Cir. 1984), *cert. denied*, 469 U.S. 1214 (1985) (quoting *United States v. Marable*, 578 F.2d 151, 154-56 (5th Cir. 1991)).

of the translated words.

9

Evaluating these factors in light of the facts of this case reveals that counts 15 and 17 involved the same conspiracy. The indictments were virtually the same.[11] Indeed the *only* difference between the charges was the time period. Count 17, while including the same period alleged in Count 15, merely extended that period by twelve days. The indictment alleged and the evidence showed that basically the same individuals were involved in the drug trafficking. Each count charged the Rena, Jr. with possessing with intent to distribute 50 kilograms of marijuana, and the evidence was clear that the hub of the conspiracy was centered in Houston, more particularly in Rena and Sons Paint and Body Shop and, to some extent, in Rena, Sr.'s home. Indeed the evidence was indisputably clear that there was one agreement among the same individuals to achieve one overall goal: to obtain and distribute marijuana.

---

[11] Count 15 charged as follows:

From on or about March 1, 1990, to on or about March 3, 1990, in the Southern District of Texas and within the jurisdiction of the Court, Defendants MIKE TAGLE RENA, MIKE RENA, JR., and JOSE LUIS RENA did knowingly and intentionally conspire and agree together and with other persons known and unknown to the Grand Jurors to knowingly and intentionally possess with intent to distribute a quantity exceeding 50 kilograms of marihuana, a Schedule I controlled substance.

Count 17 charged:

From on or about March 1, 1990, to on or about March 15, 1990, in the Southern District of Texas and within the jurisdiction of the Court, Defendants MIKE TAGLE RENA, MIKE RENA, JR., and JOSE LUIS RENA did knowingly and intentionally conspire and agree together and with other persons known and unknown to the Grand Jurors to knowingly and intentionally possess with intent to distribute a quantity exceeding 50 kilograms of marihuana, a Schedule I controlled substance.

10

Based upon the charges in the indictment and the extensive evidence presented throughout the trial of this case we find as a matter of law that counts 15 and 17 involved but one conspiracy.

C. Sufficiency of the Evidence

Our final task is to determine whether there was sufficient evidence to convict Rena, Jr. of conspiring to engage in the trafficking of marijuana.[12]  Because Rena, Jr. properly moved for judgment after the close of the Government's evidence and again after the close of all of the evidence, the proper standard of review is whether, when viewing the evidence and all of the inferences which could be reasonably drawn therefrom in a light most favorable to the verdict any rational trier of fact could have found each *prima facie* element of conspiracy beyond a reasonable doubt.  *United States v. Menesses*, 962 F.2d 420, 426 (5th Cir. 1992) (citing *United States v. Pigrum*, 922 F.2d 249, 253 (5th Cir.), *cert. denied*, 111 S.Ct. 2063 (1991));  *United States v. Robles-Pantoja*, 887 F.2d 1250, 1253 (5th Cir. 1989).  The Court is to review all of the evidence which supports the Government-- whether direct, circumtantial, or both--as well as the inferences which a reasonable juror could draw therefrom.  *Menesses*, 962 F.2d at 426.  Although a jury may rely on circumstantial evidence in convicting a defendant, convictions may not rely solely upon suspicions of guilt.  *See United States v. Sacerio*, 952 F.2d 860,

---

[12]  Rena, Jr. argues and the Government concedes that there is no evidence of his guilt of the conspiracy charged in count 11.  Thus, our review is limited to the evidence which supported the guilty verdict in count 17.

864 (5th Cir. 1992).

The Government was required to prove that Rena, Jr. had agreed with at least one other person to possess and distribute more than 50 kilograms of marijuana, that he knew the conspiracy existed, and that he intentionally participated in the conspiracy. *See Menesses*, 962 F.2d at 426. We find that adequate evidence existed to prove beyond a reasonable doubt that Rena, Jr. was involved in the drug conspiracy.

Among other things, the Government presented evidence of Rena, Jr.'s telephone conversations with his father with respect to Joe Rena's trip up north to deliver 136 pounds of marijuana. The Renas had apparently planned to sell the drugs to Pop, who lived in Maryland. At 7:35 a.m. on March 3, 1990, Rena, Sr. called Rena, Jr. to ask if he had talked with Pop. Rena, Jr. explained that he had tried to call Pop on the prior evening, but that his efforts had proven unsuccessful. Rena, Sr. apprised Rena, Jr. that "Joe's getting everything ready," and implied that they needed to talk with Pop soon. Rena, Jr. responded that he knew that and asked Rena, Sr. to try. After Rena, Sr. agreed, Rena, Jr. said, "Call me, let me know what happens."

Rena, Sr. called Pop in Maryland fewer than ten minutes later to tell him that Joe was driving up to Pop's area and would have with him "125 or 126" which had the good smell. The same morning, at 8:11 a.m., Rena, Sr. again called Pop to inform him of the time that Joe was scheduled to arrive. Approximately one hour later, Rena, Sr. called Rena, Jr. to tell him that he had talked with Pop

12

and that there was now no need for Rena, Jr. to call. Based upon the interception of these and other calls the DPS dispatched surveillance teams which watched Joe Rena, stopped him, gained permission to look into the trunk of his automobile, and found 126 pounds of marijuana which, indeed, had a strong smell.

Viewing the evidence in a light most favorable to the Government, a rational trier of fact could have determined beyond a reasonable doubt that Rena, Jr. knew of the plan for Joe to drive to Maryland to deliver 126 pounds of marijuana, that Rena, Jr. had agreed with Rena, Sr. to talk with Pop, and that Rena, Jr. intentionally participated in the conspiracy by attempting to call Pop at least one time to inform him of the drugs which Joe was scheduled to deliver.

Based upon this and other evidence[13] we find that there was sufficient evidence of Rena, Jr.'s involvement in the marijuana

---

[13]  The Government also presented evidence of calls from Rena and Sons Paint and Body Shop on March 11, 1990. During those conversations Rena, Sr. informed a man who was involved in their drug ring that Rena, Jr. was calling "over there" "so he can send him a small part." Fifteen minutes later Rena, Sr. told another employee to tell a caller bring a slice of the meat to the body shop. Two minutes later, Rena, Jr. called to tell an unknown male not to send David if "it's the same s__t." Less than an hour later, Rena, Sr. informed an individual that the meat was too expensive and too humid and that it was not the quality which a third person desired.

The Government presented testimony of a Sergeant Investigator who had worked in the Texas Department of Public Safety Narcotics Service for nine years that he believed that the "meat" was actually a code word for marijuana, and that in his opinion, the defendants were discussing marijuana.
This evidence, when viewed in a light most favorable to the Government, shows that Rena, Jr. was involved in the attempted acquisition of marijuana, and we believe that a rational trier of fact could have so found.

conspiracy alleged in Count 17 of the indictment.

### III. Conclusion

This Court has previously stated that transcripts of recorded conversations are admissible. Even so, in the usual case, this Court would be constrained to reverse a conviction which is based upon evidence like that found here, but this is not the usual case. Thus, we affirm the conviction of Rena, Sr. on all counts, affirm the conviction of Rena, Jr. on count 17 and reverse his convictions on counts 11 and 15, and remand.