**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
June 4, 2009

Charles R. Fulbruge III
Clerk

No. 08-40884

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

JOSE LUIS GARCIA

Defendant-Appellant

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 7:07-CR-840-1

Before REAVLEY, WIENER, and SOUTHWICK, Circuit Judges.

PER CURIAM:[*]

Defendant-Appellant Jose Luis Garcia was convicted by a jury of (1) conspiracy to possess with intent to distribute more than 100 but less than 1,000 kilograms of marijuana in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846 (Count One); (2) possession with intent to distribute more than 100 but less than 1,000 kilograms of marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B), and 18 U.S.C. § 2 (Count Two); (3) possession of a firearm by a felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Count Three); and (4)

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count Four). He appeals his convictions on all counts, contending that he is entitled to a judgment of acquittal because there was insufficient evidence to support the jury's verdict. Garcia also asserts that the district court abused its discretion in permitting the jury access to transcripts of wiretapped phone conversations during its deliberations. Finding no reversible error, we affirm Garcia's conviction.

## I. FACTS AND PROCEEDINGS

DEA agents who were investigating Dallas members of a drug-trafficking organization, the Gulf Cartel, intercepted communications from the Dallas area to a cell phone operating in Starr County, Texas. The calls identified the user of this phone as "Gordito." According to the DEA, "Gordito" had conversations with a high-level Gulf Cartel member named Jose Antonio Rodriguez Macias, also known as "Gordo." In the calls, "Gordito" revealed that he owned two vehicles, a Chrysler 300M and a black Hummer H3. According to local law enforcement, these vehicles "stood out" in rural Starr County. The description of the vehicles led officers to a residence that had two such vehicles outside of the house. A DEA agent photographed the vehicles, and when agents ran the license plates, they learned that both the Chrysler and the Hummer were registered to Defendant-Appellant Garcia at 29 Alvarez Avenue in Rio Grande City, Texas.

DEA Agents also determined that the Starr County cell phone belonged to Garcia and, on April 30, 2007, they received judicial approval for a wiretap of the phone. The agents then began electronic surveillance of the phone and physical surveillance of Garcia. They positively identified Garcia as "Gordito" when "Gordito" made phone calls in which he accurately described at least four DEA vehicles that followed him at various times and told others that he knew he was being followed. At trial, Special Agent Aldo Benavides provided

testimony that he recognized the voice of "Gordito" which he had heard on surveilled phone calls for three months as that of Garcia.

On June 27, 2007, agents intercepted calls that led them to believe that a load of drugs would be moved the following day from Rio Grande City to an unknown location. During a phone call that Garcia made the next morning, he stated that he had spotted Special Agent Benavides's blue truck. The agents then lost track of Garcia but inferred from calls and "cell site information" that he was traveling east toward Edinburg, Texas. Special Agent Chris Bell drove toward the area where agents thought Garcia would be. Thereafter, Special Agent Bell drove past three vehicles, (1) a white Ford Excursion, (2) a Chevrolet Dooley truck pulling a trailer, and (3) Garcia's Chrysler 300M with Garcia behind the wheel. Special Agent Bell followed the vehicles to a "small ranch hay farm" with a pink beauty shop next to it. Intercepted phone calls had indicated that the load location for the marijuana would be next to a pink beauty shop. For approximately 45 minutes, Agents Bell and Benavides waited at the entrance to the property for backup to arrive. Phone calls demonstrated that Garcia and his alleged co-conspirators had detected law enforcement's presence on the scene. The agents then intercepted a call which revealed that their suspects planned to flee via the back of the ranch, i.e., in the opposite direction of the agents' vehicles. The agents followed a white Chevrolet truck departing the ranch at a high speed. When they stopped the vehicle, they confirmed that it was registered to Garcia and driven by alleged co-conspirator Ruben Alaniz. Garcia was not apprehended at that time.

A ranch hand, Juan Gaytan Mejia, testified that he had seen one of Garcia's alleged co-conspirators, Juan Alaniz, the brother of Ruben Alaniz, enter the property driving the Chevrolet Dooley with the trailer. Gaytan Mejia testified that he witnessed marijuana being unloaded from the trailer but that then, "they all disappeared."

That day, Officer Blas Garcia of the Hidalgo County Sheriff's Office executed a warrant to search the ranch. There, police officers found the Ford Excursion and Chevy Dooley connected to a trailer that contained 925.9 kilograms of marijuana in a false compartment.

Based on these facts and an extensive series of phone interceptions, the agents deduced that Garcia was the supervisor of the drug trafficking operation. Accordingly, the agents continued to intercept calls from Garcia's phone, including instructions to his wife to remove things from the house, *inter alia*, money and weapons, because he thought that the police would raid the property.

On August 16, 2007, officers arrested Garcia and executed a warrant to search his residence.[1] After awakening Garcia, United States Border Patrol Agent Cruz Esquivel asked him if there were any firearms present. According to Agent Esquivel, Garcia initially responded "no," then said, "Yes, there's one under my pillow." The officers then seized a .45 caliber pistol from under Garcia's pillow, as well as a .22 caliber Derringer from the night-stand by Garcia's bed. Their search also uncovered a "vacuum jug of marijuana," "small drug ledgers" that listed names of alleged co-conspirators, and a radio scanner capable of intercepting police frequencies.

In September 2007, a grand jury charged Garcia with the four counts that are the subject of this appeal. After a four-day trial, the jury convicted Garcia on each count. He timely filed a notice of appeal.

---

[1] The agents contend that they delayed the arrest and search several weeks to ensure that they would not interfere with active investigations of other alleged Gulf Cartel members.

## II. ANALYSIS

### A.   Sufficiency of the Evidence

#### 1.  Standard of Review

When, as here, an appellant renews his motion for acquittal after the close of all evidence, we review the sufficiency of the evidence *de novo*.[2]  "In assessing a challenge to the sufficiency of the evidence, we must determine whether, viewing all the evidence in the light most favorable to the verdict, a rational jury could have found that the evidence established the elements of the offense beyond a reasonable doubt."[3]  Additionally, we draw all reasonable inferences and make all credibility determinations in favor of the verdict.[4]  Yet, when viewing the evidence in a light most favorable to the verdict "gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, the conviction should be reversed."[5]

#### 2.   Counts One and Two – Possession With Intent to Distribute; Conspiracy to Possess

##### i.   Applicable Law

To convict a defendant for possession of marijuana with the intent to distribute it, here Count Two, "the government must prove (1) possession, (2) knowledge, and (3) intent to distribute.  Intent to distribute may be inferred

---

[2] *United States v. Alarcon*, 261 F.3d 416, 421 (5th Cir. 2001).

[3] *United States v. Ollison*, 555 F.3d 152, 158 (5th Cir. 2009) (internal quotation marks omitted).

[4] *Id.*

[5] *Id.* (citation omitted).

from the large quantity of drugs involved."[6]  Similarly, proof of knowledge is usually based on inferences and circumstantial evidence.[7]

The elements of *conspiracy* to possess with intent to distribute at least 100 kilograms of marijuana, here, Count One, are "(1) an agreement with one other person to possess with intent to distribute at least [100] kilograms of [marijuana]; (2) defendant's knowledge of the agreement; and (3) defendant's voluntary participation in the conspiracy."[8]  "Mere presence at a crime scene or association with conspirators is not enough to prove participation in a conspiracy, but the agreement, a defendant's guilty knowledge and a defendant's participation in the conspiracy all may be inferred from the development and collocation of circumstances."[9]

### ii. Merits

In his appellate brief, Garcia concedes that the evidence established the existence of a conspiracy to possess marijuana with the intent to distribute it, but he contends that "the government failed to establish beyond a reasonable doubt appellant was the person whose voice was heard on the intercepted conversations critical to determining guilt."  Garcia contends that, in the absence of a scientific test to match his voice to the recorded voice of "Gordito," he was only indirectly implicated in the conspiracy and that Agent Benavides's testimony about recognizing Garcia's voice should be discounted.  In sum, Garcia contends that his convictions were based on "mere speculation" rather than

---

[6] *United States v. Valdez*, 453 F.3d 252, 260 n.7 (5th Cir. 2006) (citation omitted).

[7] *United States v. Romero-Reyna*, 867 F.2d 834, 836 (5th Cir. 1989) (citation omitted).

[8] *United States v. Percel*, 553 F.3d 903, 910 (5th Cir. 2008); *see United States v. Patino-Prado*, 533 F.3d 304, 309 (5th Cir. 2008) (per curiam).

[9] *Valdez*, 453 F.3d at 257 (internal quotation marks omitted).

"reasonable inferences."[10] Interpreting Garcia's brief as attacking only the evidentiary basis underlying the jury's conclusion that he was in fact "Gordito," we reject his argument.

Special Agent Benavides testified that after three months of listening to "Gordito's" calls, he was familiar with the voices he routinely heard and that, in a post-arrest interview, he recognized Garcia's voice as that of "Gordito." Garcia does not contend that the testimony was inadmissible;[11] instead he challenges its weight. The jury, however, "is charged with determining whether testimony is credible and, if so, what weight it should be given."[12] Viewing the evidence in a light most favorable to the verdict, we defer to Special Agent Benavides's recognition of Garcia's voice from the tapes. That recognition, which was based on extensive audio recordings and the agent's interview with Garcia, together with the facts set forth above in the Facts and Proceedings section of this opinion — for example, "Gordito's" positive identification of law enforcement vehicles as he was being followed and Special Agent Bell's visual identification of Garcia in a vehicle traveling alongside the other suspect vehicles on the day of the marijuana bust — are sufficient to support the jury's finding that Garcia and "Gordito" are one and the same person. We conclude that there is sufficient evidence to support a rational jury's guilty verdict on Counts One and Two.

---

[10] *See United States v. Beckner*, 134 F.3d 714, 719 (5th Cir. 1998) ("[T]he circumstantial evidence here did not permit the jury to draw a reasonable inference of guilty knowledge; rather, the government's evidence invited only speculation and conjecture.").

[11] Federal Rule of Evidence 901(b)(5) sanctions the identification of a voice "by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker." FED. R. EVID. 901(b)(5).

[12] *United States v. Mendoza*, 522 F.3d 482, 489 (5th Cir. 2008).

**3.    Counts Three and Four – Firearms Charges**

**i.    Applicable Law**

To establish Count Three, possession of a firearm by a felon, the government had the burden to prove beyond a reasonable doubt: "(1) that the defendant previously had been convicted of a felony; (2) that he possessed a firearm; and (3) that the firearm traveled in or affected interstate commerce."[13] Count Four, possession of a firearm in furtherance of a drug trafficking offense, prescribes punishment for, *inter alia*, any person who, in furtherance of any drug trafficking crime, possesses a firearm.[14]

**ii.    Merits**

Garcia challenges only the possession element of his firearms convictions. He contends that "it [was] mere conjecture to conclude Appellant possessed the weapons" and that they could have belonged to his wife, particularly given that the agents never confirmed the ownership of the weapons. The jury, however, reasonably concluded that Garcia possessed the firearms. Agent Esquivel testified that Garcia responded to police that there was a weapon under *his* pillow, located where *he* had been sleeping. U.S. Border Patrol Agent Patrick Freeman corroborated this version of events. Although the jury did not have an obligation to credit the testimony of these agents, there is no question that, viewing the evidence in a light most favorable to the verdict, there was sufficient evidence on which the jury could have based its conviction on the firearms charges.

---

[13] *United States v. Guidry*, 406 F.3d 314, 318 (5th Cir. 2005); *see* 18 U.S.C. § 922(g)(1).

[14] 18 U.S.C. § 924(c)(1)(A); *see United States v. Yanez Sosa*, 513 F.3d 194, 203 (5th Cir. 2008).

## B. Whether the District Court Abused Its Discretion in Allowing the Jury Access to Wiretap Transcripts During Deliberations

### 1. Standard of Review

"We review the district court's evidentiary rulings for abuse of discretion."[15] "Even if the district court errs in its evidentiary ruling, the error can be excused if it was harmless."[16] "'A nonconstitutional trial error is harmless unless it had substantial and injurious effect or influence in determining the jury's verdict.'"[17]

### 2. Applicable Law

Federal Rule of Evidence 611 confers on "trial court[s] discretion to control the presentation of evidence," including the use of demonstrative evidence.[18] "Allowing the use of . . . 'pedagogical' devices intended to present the government's version of the case is within the bounds of the trial court's discretion to control the presentation of evidence . . . . Such demonstrative aids typically are permissible to assist the jury in evaluating the evidence, provided

---

[15] *United States v. Colomb*, 419 F.3d 292, 297 (5th Cir. 2005) (internal quotation marks omitted).

[16] *United States v. Ollison*, 555 F.3d 152, 161 (5th Cir. 2009).

[17] *Id.* at 162 (quoting *United States v. Hart*, 295 F.3d 451, 454 (5th Cir. 2002)).

[18] *Id.* Rule 611(a) provides:

The court shall exercise reasonable control over the mode and order of . . . presenting evidence so as to (1) make the . . . presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

FED. R. EVID. 611(a); *see* FED. R. EVID. 611 advisory committee's note (indicating that Rule 611(a) covers the "use of demonstrative evidence"); *see also Colomb*, 419 F.3d at 297 ("Unlike the vast majority of the other Evidence Rules, Rule 611 does not purport to regulate the admissibility of evidence. Instead, the rule gives trial courts broad powers to control the 'mode and order' of what is otherwise admissible evidence." (citation omitted)).

the jury is forewarned that [they] are not independent evidence."[19] Demonstrative aids are not admitted into evidence and should not go to the jury room absent the consent of the parties.[20] And, if the jury is exposed to extrinsic evidence, we ask whether it had a prejudicial effect on the verdict.[21]

Our precedent on demonstrative aids often involves the use of a chart or diagram.[22] In the instant case, however, the parties stipulated to the use of audio recordings as an aid for the jury to follow the recordings. Although we have cautioned against thinking of a transcript as a mere utilitarian aid,[23] this and other circuits approve the use of such transcripts as demonstrative evidence

---

[19] *United States v. Taylor*, 210 F.3d 311, 315 (5th Cir. 2000) (internal quotation marks omitted) (discussing the use of charts).

[20] *Id.* In contrast, Federal Rule of Evidence 1006 addresses the "summar[y of] documents or other evidence too voluminous to present effectively and efficiently to the jury." *United States v. Buck*, 324 F.3d 786, 790 (5th Cir. 2003). When, as here, the demonstrative aid was not offered into evidence, Rule 1006 does not govern its use at trial. *See United States v. Posada-Rios*, 158 F.3d 832, 869 (5th Cir. 1998).

[21] *See United States v. Smith*, 354 F.3d 390, 395–96 (5th Cir. 2003). In *Smith*, we recognized the modification of the rule of *United States v. Luffred*, in which we had indicated "that any intrusion on the jury, no matter how slight, creates a rebuttable presumption of prejudice." *See Smith*, 354 F.3d at 395 (citing *Luffred*, 911 F.2d 1011, 1014 (5th Cir. 1990)). We emphasized that the better rule was that "'only when the court determines that prejudice is likely should the government be required to prove its absence.'" *Id.* (quoting *United States v. Sylvester*, 143 F.3d 923, 934 (5th Cir. 1998)); *see Dorsey v. Quarterman*, 494 F.3d 527, 531 (5th Cir. 2007) (noting factors relevant to putative prejudice — "[t]he content of the extrinsic material, the manner in which it came to the jury's attention, and the weight of the evidence against the defendant").

[22] *See, e.g.*, *Buck*, 324 F.3d at 789–91 (summary diagram depicting connections between the defendant and misapplied payments); *Taylor*, 210 F.3d at 314–15 (organizational chart purporting to list the players in a drug conspiracy and their respective positions within the hierarchy).

[23] *United States v. Onori*, 535 F.2d 938, 947 (5th Cir. 1976) ("It is . . . incorrect to think of the transcripts as simply an 'aid' as better lighting fixtures in the courtroom would be an 'aid' to the jury's vision of witnesses and not as evidence of any kind."). Our opinion in *Onori* "established a procedure for accommodating the potential for variance in adversaries' transcripts." *United States v. Wilson*, 578 F.2d 67, 69–70 (5th Cir. 1978). The instant case is distinguishable because Garcia did not offer his own transcript varying with that of government.

that "like other evidence, may be admitted for a limited purpose only,"[24] *viz.*, the limited purpose of aiding the jury in understanding the recording by identifying the speakers or understanding portions which are difficult to hear.[25]

### 3.   Merits

Garcia stipulated to the admission of the government's exhibits 1A through 62A, the audio recordings of intercepted phone calls. He also stipulated to the limited use of the transcripts of those calls, the government's exhibits 1B through 62B, "because [he] didn't want [the prosecution] sitting here for 40 days and 40 nights reading that stuff to [the jury]." The transcripts labeled each speaker, identifying "Gordito" as Garcia. Garcia agreed to the use of the transcripts as an aid to the jury but not to their admission into evidence. He made clear that if the jury were later to make a request related to confusion on one of the recordings, the jury could and should listen to the tapes, i.e., "let the tapes speak for themselves." The court responded that "we always instruct them in that regard." The prosecution agreed that the "transcript is merely an aid" and that "the best evidence is the call itself." Accordingly, the court provided a cautionary instruction just before the government first played the recordings, and the court's final jury instructions included the following:

> Certain exhibits have been identified as typewritten transcripts and translations from Spanish into English of the oral conversations which can be heard on certain tape recordings received in evidence. The transcripts also purport to identify the speakers engaged in

---

[24] *Onori*, 535 F.2d at 947; *see, e.g.*, *United States v. Frazier*, 194 F. App'x 694, 698 (11th Cir. 2006) (per curiam) (unpublished and considered only persuasive authority per 11TH CIR. R. 36-2) (noting that the district court admitted a transcript of a conversation as an aid during playing of a tape for the jury); *United States v. Olguin*, 428 F.3d 727, 729–30 & n.4 (8th Cir. 2005) (same); *Stringel v. Mehodist Hosp. of Ind., Inc.*, 89 F.3d 415, 419 (7th Cir. 1996) ("[T]he transcript itself was only a demonstrative exhibit."); *United States v. Ramirez*, 45 F.3d 1096, 1101 (7th Cir. 1995) ("[T]he transcript was simply demonstrative evidence designed to aid the jury.").

[25] *Wilson*, 578 F.2d at 69–70.

such conversations. I have admitted the transcripts for the limited and secondary purpose of aiding you in following the content of the conversations as you listen to the tape recording, and also to aid you in identifying the speakers. *You are specifically instructed that whether the transcript correctly or incorrectly reflects the content of the conversation or the identity of the speakers is entirely for you to determine based upon your own evaluation of the testimony* you've heard concerning the preparation of the transcript, and from your own examination of the transcript in relation to your hearing of the tape recording itself, which is the primary evidence of its own contents; and, if you should determine that the transcript is in any respect incorrect or unreliable, then you should disregard it to that extent.[26]

Garcia did not object to this instruction, and initially the court did not provide the transcripts to the jury. During its deliberations, however, the jury sent a series of notes to the court, including Jury Notes 2, 3, and 4, which bear on this issue. Jury Note 2 asked for a laptop computer to listen to audio recordings. Soon after it made arrangements to comply with this request, the court received Jury Note 3, which asked for a copy of the complete transcript of the recordings. Outside the presence of the jury, the court acknowledged that the transcripts were admitted only as "aid to follow along" but ventured that any error in granting the jury's request "certainly . . . would be harmless error given that they have already seen the transcript, and given the Court's cautionary instruction." Garcia objected, urging that it would constitute error to allow an item not in evidence into the jury room to be considered by the jury, given his stipulation that the transcripts would be used solely as a demonstrative aid in the courtroom. The trial court then indicated that it would *not* send the transcripts to the jury room and would instead bring the jury into the courtroom

---

[26] (emphasis added). The court's initial instruction was substantially similar to this quoted final instruction.

to listen to the desired recordings while referencing the transcripts. Garcia agreed to the court's plan.

Accordingly, the court prepared to implement this plan by sending a written answer to Jury Note 3, asking the jury to specify which transcripts it wished to review. It responded with Jury Note 4, requesting a complete copy of the recordings that had been distributed to the jurors. At that juncture, the trial court realized that the jury did not want the transcripts in connection with just a small portion of the wiretap recordings; it wanted to consider the transcripts in their entirety. Deciding that "to bring them in here and play everything over for them and hand them the transcript seems unnecessary," the trial court acceded to the jury's request to have the transcripts sent to the jury room. Garcia objected, but the court overruled the objection. Before it sent the transcripts to the jury room, however, the court had the jury brought into the courtroom and gave an instruction similar to the two it had previously given.[27]

---

[27] The court instructed:

> You've asked for twice now transcripts of the recordings. Those transcripts are not evidence. They were merely an aid. The evidence is the actual recording. That's the evidence. What is actually recorded, the voices and what they said. These transcripts were admitted for your aid for the limited and secondary purpose of aiding you in following the content of the conversation as you listened to those tape recordings, and it was also to aid you in identifying the speakers. I'm going to give you those transcripts again with the same instruction which is also included in the charge that I gave you. *You are instructed that whether the transcripts correctly or incorrectly reflects the content of the conversation or the identity of the speakers is entirely for you to determine based upon your own evaluation of the testimony* you've heard concerning the preparation of the transcript and from your own examination of the transcript in relation to hearing the tape recordings itself, which is the primary evidence of its own contents. If you should decide or determine that the transcript is in any respect incorrect or unreliable then you should disregard the transcript to that extent.

(emphasis added).

On appeal, Garcia contends that because the government's case depended on the jury believing that Garcia was the person speaking on the tapes, the transcripts which labeled "Gordito" as Garcia improperly bolstered the government's allegation of the speaker's identity. Garcia contends further that, in light of his two co-defendants' acquittals, the jury's guilty verdict proves that the transcripts were prejudicial.

Even assuming *arguendo* that the trial court erred,[28] we remain convinced that any error was harmless. Several factors lead us to this result: (1) The district court thrice gave the jury an appropriate instruction emphasizing that the transcripts served only a "limited and secondary purpose" and that the jury was to evaluate whether the transcript accurately reflected the identity of the speakers;[29] (2) Garcia challenges only the labeling of "Gordito" as Garcia, not the accuracy or quality of the transcriptions;[30] and (3) we have no doubt that the jury was aware that it had an independent duty to decide whether Garcia was

---

[28] Demonstrative aids that are not admitted into evidence should not be sent into the jury room. *See United States v. Taylor*, 210 F.3d 311, 315 (5th Cir. 2000).

[29] *See United States v. Patino-Prado*, 533 F.3d 304, 313 (5th Cir. 2008) (per curiam) ("We will presume that jurors understand and follow their instructions, abandoning that presumption only when there 'is an overwhelming probability that the jury will be unable to follow the instruction and there is a strong probability that the effect is devastating.'" (quoting *United States v. Barksdale-Contreras*, 972 F.2d 111, 116 (5th Cir. 1992)); *United States v. Onori*, 535 F.2d 938, 949 (5th Cir. 1976) ("As with other forms of potentially prejudicial evidence, the key to protecting the defendant's rights in this [transcripts-of-tapes] situation lies in seeking limiting instructions."); *see also United States v. Stone*, 960 F.2d 426, 438 (5th Cir. 1992) ("[I]t was the province of the jury to decide whether the government's transcript was accurate, and the obligation of the defendants to raise specific challenges to the transcript before the jury"*).

[30] *Cf. Wilson*, 578 F.2d at 69 (arguing that "the government's transcript improperly supplied otherwise unintelligible portions of the taped conversation").

"Gordito" despite the government's attribution of the transcribed "Gordito" conversations to Garcia.[31]

Our decision in *United States v. Larson*[32] provides additional support for our conclusion that if any error was committed, it was harmless. In that case, the trial court allowed the jury to read written transcripts of taped conversations as they were played in court.[33] The tapes were received in evidence; the transcripts were not.[34] The trial court gave cautionary instructions similar to those given by the court in the instant case.[35] The *Larson* court permitted access to a transcript after the jury had retired to deliberate, and the defendant in *Larson* objected, asserting that "only formally admitted 'evidence' may be used for jury deliberations."[36] In rejecting that argument, we stated:

> In view of the court's charge to the jury and the fact that the jurors had already read the transcript during trial, we decline to find that the failure to formally introduce what the trial judge referred to as 'quasi-admitted' evidence was anything other than harmless error. We find no prejudice arising from the jury's brief second look at the transcript.

---

[31] In addition to the court's repeated cautionary instructions, Special Agent Benavides explained on cross-examination how the agents made their decisions to add suspects' names to that of the aliases, i.e., it was clear that the transcript was not some court-sponsored "official transcript." Additionally, counsel for Garcia stressed to the jury that they should not speculate that they had heard Garcia's voice on the tapes. Implying that the jury should infer that the "Gordito" of the tapes was some other "Gordito," counsel represented that the nickname was common — in fact, so common that "Gordito" was counsel's own nickname.

[32] 722 F.2d 139 (5th Cir. 1983).

[33] *Id.* at 144

[34] *Id.*

[35] *Id.* at 144 n.11, 145 n.12.

[36] *Id.* at 145.

In *Larson*, we concluded by emphasizing that "we are in accord with the Eleventh Circuit in . . . refus[ing] to find error in [this] use of transcripts during jury deliberations 'absent anything more than a presumption' that the transcripts were the reason for the guilty verdict and 'a generalized claim that the jury must have been prejudiced.'"[37]

Even if we were tempted by Garcia's argument, *Larson* would still weigh against our granting relief. Any error in providing the transcripts of the phone calls to the jury here was harmless. Garcia's appeal on this ground fails.

### III. CONCLUSION

Finding no reversible error, we AFFIRM Garcia's conviction.

---

[37] *Id.* (quoting *United States v. Costa*, 691 F.2d 1358, 1363 (11th Cir. 1982)); *see also United States v. Puerta Restrepo*, 814 F.2d 1236, 1242 (7th Cir. 1987) (allowing a jury to have transcripts in deliberations even though the identity of one of the speakers named on the transcript was disputed).